SAM FRIED, PLAINTIFF-APPELLANT, v. JOHN A. KERVICK, TREASURER OF THE STATE OF NEW JERSEY, ET AL., DEFENDANTS-RESPONDENTS.

Argued November 21, 1960—Decided January 23, 1961.

Mr. *Edward B. Meredith* argued the cause for plaintiff-appellant.

Mr. *Murry Brochin,* Deputy Attorney General, argued the cause for defendants-respondents (*Mr. David D. Furman,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

FRANCIS, J. Plaintiff Sam Fried, a retail gasoline dealer, sought a Superior Court injunction restraining the enforcement of *N. J. S. A.* 56:6–2(a), (c), (d), (e), which regulates certain aspects of the retail sale of gasoline. The relief sought was predicated upon a claim that the statute is unconstitutional. The Chancery Division found otherwise and granted summary judgment for the defendant. Plaintiff's subsequent appeal to the Appellate Division was certified on our motion prior to argument there.

*N. J. S. A.* 56:6–2(a) requires retail dealers to post certain signs on their pumps or other dispensing equipment stating the price per gallon of the gasoline sold, which price is to include all State and Federal taxes. The sign, however, must state, either the amount of the taxes included or, without specifying the amount thereof, that the taxes

are included in the price. The subsection further provides that sales shall not be made at any price other than that posted, and that the price when displayed shall remain posted and in effect for not less than 24 hours. Subsections (c) and (d) impose further restrictions with respect to the signs or other advertising. Subsection (e), which presents the crux of the controversy, says:

"(e) No rebates, allowances, concessions or benefits shall be given, directly or indirectly, so as to permit any person to obtain motor fuels from a retail dealer below the posted price or at a net price lower than the posted price applicable at the time of the sale."

Plaintiff maintains that the sale of gasoline at retail is a private business, not one affected with a public interest, and for the Legislature to single it out for such price control is arbitrary and discriminatory and deprives it of its property in violation of the due process and equal protection clauses of the Fourteenth Amendment of the *United States Constitution*. Although the complaint seeks a determination that subsections (a), (c) and (d), as well as (e), are invalid, no argument is made that the mandate for the posting of the signs or with respect to their form or size or location as such is unconstitutional. For a discussion of the constitutionality of subsection (c), see *Regal Oil Co. v. State*, 123 *N. J. L.* 456 (*Sup. Ct.* 1939). The attack in the brief and on oral argument was directed at subsection (e) alone.

The record presented on the motion for summary judgment showed that plaintiff was knowingly engaged in selling gasoline which was within the terms of the Fair Trade Act, *R. S.* 56:4–1 to 6, as amended *L.* 1938, *c.* 165 and *L.* 1940, *c.* 230, at less than his posted (and fair trade) price. It appeared also that 94.44% of all the gasoline sold in New Jersey by distributors to retailers is subject to fair trade price agreements.

The statute being assailed, *N. J. S. A.* 56:6–2(e), was adopted by the Legislature on the same day as the

amendment to the Fair Trade Act, *L*. 1938, *c*. 165. 1938 *Senate Journal* 679; 1938 *Minutes of Assembly* 943. The similarity of their subject matter, even though the latter is general in scope while the former is special, renders inescapable the conclusion that they are *in pari materia,* at least to the extent that both are reflective of the same type of legislative philosophy. *Cf. Lane Distributors, Inc. v. Tilton,* 7 *N. J*. 349, 357 (1951). It is reasonable to believe that *N. J. S. A.* 56:6–2(e) was intended to complement fair trade legislation. Almost conclusive proof of this fact comes from the simultaneous 1938 amendment of the fair trade act above described which made the act applicable to products sold from *vending equipment* bearing the brand or name of the producer. *N. J. S. A.* 56:4–5(1). Also, the statement on the bill specifies that the purpose of the amendment is to include within the jurisdiction of the act commodities sold from vending equipment bearing the trademark, brand or name of the producer or distributor of such commodities. And if (as will be discussed hereafter) the police power may be exercised as a price control measure in some areas, it might with greater reason be used to fortify the policy of a validly enacted fair trade law. See *Ed. Schuster & Co. v. Steffes,* 237 *Wis.* 41, 295 *N. W.* 737 (*Sup. Ct.* 1941).

Plaintiff insists that control of the price at which he may sell gasoline cannot be imposed constitutionally because his business is not vested with a public interest. The argument finds support in the Superior Court, Chancery Division, opinion in *Sperry & Hutchinson v. Margetts,* 25 *N. J. Super.* 568 (1953), involving this statute. On appeal, however, although this court affirmed the judgment, decision on the constitutional issue was expressly withheld. *Sperry and Hutchinson Co. v. Margetts,* 15 *N. J.* 203, 209 (1954). The notion that the authority of a state to regulate prices of commodities or services is strictly limited to those businesses which are said to be vested with a public interest stems from the traditional public utility concept. Such enterprises are those which are so operated as to justify the

conclusion that they have been devoted to a public use and the use thereby in effect granted to the public. That is the sense in which the United States Supreme Court in *Williams v. Standard Oil Co.*, 278 *U. S.* 235, 49 *S. Ct.* 115, 73 *L. Ed.* 287 (1929), approached and condemned the attempt by Tennessee to fix the prices at which gasoline could be sold within the State. After noting the only factual support for the enactment to be the widespread use of the product and the allegation that such use made it necessary to the carrying on of commercial and other activities, Justice Sutherland, writing for the majority, said that gasoline is simply an ordinary commodity of trade, "differing, so far as the question here is affected, in no essential respect from a great variety of other articles commonly bought and sold by merchants and private dealers [throughout] the country." *Id.*, 278 *U. S.*, at *p.* 240, 49 *S. Ct.*, at *p.* 116. And he ruled for the court that extensive use of the product did not bring the business which sold it within the phrase "affected with a public interest," the standard by which the validity of price fixing legislation, in respect to such a business, must be tested. *Ibid*, and see *Ribnik v. McBride*, 277 *U. S.* 350, 48 *S. Ct.* 545, 72 *L. Ed.* 913 (1928). The opinion in *Williams* does not suggest in the slightest that there were any evils or unfair trade practices or conditions associated with retail sale thereof which so adversely affected the public welfare as to warrant the criticized legislative action as an exercise of police power.

The ensuing years, as pointed out by Justice Douglas in *Olsen v. State of Nebraska*, 313 *U. S.* 236, 61 *S. Ct.* 862, 85 *L. Ed.* 1305 (1941), saw a great drift away from the restricted viewpoint of the *Williams* case and *Tyson & Bro., etc. v. Banton*, 273 *U. S.* 418, 47 *S. Ct.* 426, 71 *L. Ed.* 718 (1927), *Ribnik v. McBride, supra,* and the like, on which it was based. Perhaps the clearest example of the trend is found in *Nebbia v. People of State of New York*, 291 *U. S.* 502, 54 *S. Ct.* 505, 78 *L. Ed.* 940 (1934), which sustained regulation by New York of the resale prices of

milk. There the court redefined the phrase "affected with a public interest" in the context of such a case to mean "in the nature of things * * * no more than that an industry, for adequate reason, is subject to control for the public good." *Id.*, 291 *U. S.*, at *p.* 536, 54 *S. Ct.*, at *p.* 514. It declared with respect to the requirement of due process that a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to effectuate that policy by legislation reasonably adapted to that purpose; also that "if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise." *Id.*, 291 *U. S.*, at *p.* 537, 54 *S. Ct.*, at *p.* 516. In addition, Justice Roberts, writing for the majority, said:

"If the law-making body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." *Id.* 291 *U. S.*, at *pp.* 538–539, 54 *S. Ct.*, at *p.* 516.

See also *Sunshine Anthracite Coal Co. v. Adkins,* 310 *U. S.* 381, 60 *S. Ct.* 907, 84 *L. Ed.* 1263 (1940).

This court drew to itself the basic reasoning of the *Nebbia* case in passing upon the legality of retail price control of

milk (*State Board of Milk Control v. Newark Milk Co.,*
118 *N. J. Eq.* 504 (*E. & A.* 1935)), and of cigarettes (*Lane
Distributors, Inc. v. Tilton, supra*). (Although the latter
act was invalidated, approval of the price regulation was
given.) The matter of price-cutting, rebates, discounts or
selling below cost was regarded as a practice which may
directly affect the welfare of the community and therefore
within the limits of strictures authorized by the police
power. *Lane Distributors, Inc. v. Tilton, supra,* 7 *N. J.,* at
*p.* 365. It was further said that where conditions in a
business become such that the welfare of the public will not
be adequately protected by unrestricted competition, or if
it be shown that ruinous and chaotic conditions may be thus
brought about or the economic existence of large numbers
of people is threatened, the lawmakers may step in and
prescribe appropriate non-discriminatory measures of correc-
tion or control. *Id.,* at *p.* 366.

Consideration of a claim of unconstitutionality of
a statute as transgressive of property rights and the command
for equal protection of law must be engaged in with an
awareness of the well-settled principle that a strong pre-
sumption of conformity to State and Federal organic charters
attends the enactment. The person asserting such basic
invalidity has the burden of overcoming the presumption.
*Jamouneau v. Harner,* 16 *N. J.* 500, 515 (1954), *cert.* denied
349 *U. S.* 904, 75 *S. Ct.* 580, 99 *L. Ed.* 1241 (1955). Where
regulation of a particular type of business is involved and
the allegation of unconstitutionality is predicated upon a
charge of discrimination, courts uniformly sustain the law
if any reasonably conceivable basis exists for separate treat-
ment and if the treatment is not arbitrary or unreasonable.
*Robson v. Rodriquez,* 26 *N. J.* 517, 524 (1958). And it
has been said that the person making the attack to be success-
ful must negative every conceivable basis which may rea-
sonably support the legislative action. *Dickinson v. Porter,*
240 *Iowa* 393, 35 *N. W. 2d* 66, 71 (*Sup. Ct.* 1948), app.
dis. 338 *U. S.* 843, 70 *S. Ct.* 88, 94 *L. Ed.* 515 (1949).

As was indicated in the *Nebbia* case, *supra,* the police power of a state is incapable of precise definition and limitation. It develops by an empiric process and its boundaries expand to include authority to regulate an evil associated with any business which for the public good justifies the particular measure of control. The Legislature is presumed to know the needs of the people and it may draw distinctions based upon degrees of evil without being arbitrary. *Townsend v. Yeomans,* 301 *U. S.* 441, 57 *S. Ct.* 842, 81 *L. Ed.* 1210 (1937). Over 50 years ago South Dakota banned as unfair competition price discriminations in the sale of commodities in different sections, communities or cities of the state. The United States Supreme Court sustained the act, holding that if a legislature finds that a particular instrument of trade war is being used against the public welfare in certain cases, it may "direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so nonetheless that the forbidden act does not differ in kind from those" against which the particular legislation does not operate. *Central Lumber Co. v. State of South Dakota,* 226 *U. S.* 157, 160, 33 *S. Ct.* 66, 67, 57 *L. Ed.* 164 (1912).

*N. J. S. A.* 56:6-2(e) within its own framework is not discriminatory; it applies equally to all retail gasoline dealers operating in the State. *Cf. People v. Arlen Service Stations,* 284 *N. Y.* 340, 31 *N. E. 2d* 184 (*Ct. App.* 1940). All persons in the same situation are uniformly affected. Whether they may be classified for separate regulation and price control depends upon the existence in their industry of an actual or potential particular evil which justifies application of the police power for the public welfare. Mention has been made above that the act under discussion may be considered as complementary to or as fortifying the fair trade act. We have no doubt on the basis of the chronology of the 1938 amendments that they both stem from legislative concern about unfair competition and unfair trade practices. As has been said, 94.44% of all gasoline sold at retail is

subject to fair trade contracts and therefore subject to the fair trade act. But even if the history of the gasoline industry shows (see *infra*) that breach of such contracts causes an evil of greater impact upon the public welfare and thus might be deemed to justify additional price control in aid of the fair trade act, we prefer to treat the presently assailed enactment as an individual piece of legislation. That approach seems advisable because *N. J. S. A.* 56:6–2(e) (and the remainder of the act as well) applies not only to fair traded gasoline but also to that sold without regard to fair trade contracts. Its application is a general requirement for the posting of price signs and for adherence to the posted price for at least 24 hours whatever the type of gasoline sold at the station. Thus the broad question is: are there reasonably conceivable actual or potential conditions associated with a business of this nature which are so inimical to the public welfare as to justify the control imposed as an exercise of the police power.

Although the issue has not been raised here, we note that in other states a requirement for posting of signs stating the sale price of the gasoline has been upheld. *Serve Yourself Gasoline Stations Ass'n v. Brock*, 39 *Cal. 2d* 813, 249 *P. 2d* 545 (*Sup. Ct.* 1952); *State v. Hobson*, 7 *Terry* 381, 46 *Del.* 381, 83 *A. 2d* 846 (*Sup. Ct.* 1951); *State v. Woilha*, 227 *Iowa* 1, 287 *N. W.* 99, 123 *A. L. R.* 884 (*Sup. Ct.* 1939); *People v. Arlen Service Stations, supra; Merit Oil Co. v. Director of Division of Neces. of Life*, 319 *Mass.* 301, 65 *N. E. 2d* 529 (*Sup. Jud. Ct.* 1946); *State v. Guyette*, 81 *R. I.* 281, 102 *A. 2d* 446 (*Sup. Ct.* 1954); Annotation 131 *A. L. R.* 1266 (1941). The reason for the holding is that the mandate represents a proper legislative effort to control the practice of deception and fraud upon the public with respect to the price charged for gasoline. And in this connection we find that the statement attached to Committee Substitute for Senate Bill No. 261, which upon adoption included *N. J. S. A.* 56:6–2(a)–(h), recited the purpose to be "to prevent fraud and unfair practices in the retail sale of motor fuels." The

New York Court of Appeals in *People v. Arlen Service Stations, supra,* regarded the price display requirement as a reasonable regulation governing the use of property offered for sale so as to prevent fraud and imposition on the public. *Regal Oil Co. v. State, supra,* appears to be to the contrary. Closely read, however, the problem actually presented had to do with the right of the station operators to display signs in addition to those required to be placed on the pumps. The additional posting was banned by *N. J. S. A.* 56:6–2(c) and that subsection alone was attacked as imposing unreasonable and arbitrary limitations on the operation of a private business. The former Supreme Court declared the limitation amounted to such an unconstitutional interference, saying that if the legislative purpose in requiring price signs is to inform the public of the price and thus to avoid fraud, additional signs of the same type more prominently displayed at places other than the pumps would tend to decrease further the possibility of unfair practices. The opinion contains some rather broad language which plaintiff relies upon in aid of the contention that subsection (e) is likewise opposed to due process. However, the full sweep of the observations cannot be considered as controlling in this instance; nor can those of similar import appearing in *Reingold v. Harper,* 6 *N. J.* 182, 190, 191 (1951). Moreover, both cases were decided without regard to *Nebbia v. People of State of New York* and *Olsen v. State of Nebraska, supra,* which we regard as expressive of more appropriate constitutional doctrine.

Another aspect of *State v. Woitha, supra* [227 *Iowa* 1, 287 *N. W.* 100], is strongly pertinent in this proceeding. The Iowa statute involved also prescribed the price-revealing signs, and, except in certain circumstances, forbade deviation from the posted price or change in the sign for twenty-four hours. The Supreme Court of Iowa, adverting to *Nebbia v. People of State of New York, supra,* rejected the argument that the dealer's "sacred right of contract" was impaired by such legislation. It pointed out that the act did not say at what price the fuel must or can be sold, but

only that the price must be posted and adhered to. By such means the legislature, realizing that the sale and price of gasoline were all important to the people of the state as an aid to transportation, public and private, was doing no more than requiring the seller to play fair by selling to all at the same price.

The Iowa court did not refer to any particular legislative history or commonly known economic facts beyond the widespread use of gasoline. The view was taken that if the legislative policy is to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory, it does not lie with the courts to determine that the rule promulgated is unwise. Much the same attitude was adopted by the Supreme Judicial Court of Massachusetts with regard to an enactment calling for price sign posting, in *Merit Oil v. Director of Division of Neces. of Life, supra,* which simply assumed that "the Legislature was motivated by knowledge that the sales of gasoline at filling stations were being conducted in such a manner as to defraud, deceive or mislead the public with reference to the prices at which the gasoline was sold." 65 *N. E. 2d,* at *p.* 531. On the same subject the Supreme Court of Rhode Island in *State v. Guyette, supra,* said that the citizen's right to pursue a lawful business is always subject to such reasonable regulation as the state may properly impose under the police power in the interest of public health, safety, morals, convenience or general welfare, and that if "a state of facts could exist which would justify legislation," a court would presume that it did exist. The opinion pointed out that the act was obviously based upon a desire to protect the general public from the effects of fraudulent misrepresentations, concealment and deception in display advertising of a commodity which is now required for the transportation of the necessities of life and of a large portion of the working public. Accordingly, the court recognized that the use and sale of motor fuel are closely related to the public convenience and general welfare of the community. 102 *A. 2d,* at *p.* 448.

We are inclined to accept the attitude of the courts referred to and approve the validity of *N. J. S. A.* 56:6–2(e) on the basis of judicial notice that the sale and use of gasoline have such a close and intimate relation to the every-day life of the community that unfair sales practices of the nature envisaged by the Legislature are subject to regulation. See *Olsen v. State of Nebraska, supra,* 313 *U. S.,* at *pp.* 246, 247, 49 *S. Ct.* 115. But there are facts of public record, bearing upon the economics involved, to most of which the Attorney General has called our attention. According to the Motor Vehicle Department there are over 2,400,000 motor vehicles registered in New Jersey. The preamble to the 1952 supplement to the act, *N. J. S. A.* 56:6–2.1 *note* (which added certain additional rules regarding the posting of price signs) under attack sets forth that the distribution and retail sale of gasoline in this State produces tax revenue in excess of thirty-five million dollars annually and that there are approximately 10,000 retail gasoline dealers engaged here in that business. It contains also the lawmakers' finding that the sale of gasoline at retail "represents an integral part of the economic life of the State affecting the welfare and prosperity of its people," that "grave economic harm to the general welfare may result if certain unfair trade practices are permitted and unrestricted" and that such practices "if unrestricted will bring about ruinous and chaotic conditions threatening the economic existence of retail dealers engaged in such business."

Prior to the adoption of this supplement the Report of the New Jersey Gasoline Study Commission had been submitted to the Governor and the Legislature pursuant to Assembly Resolution No. 7 of 1952. Among other things it said:

"Regardless of the temporary benefits of price wars to motorists in the form of reduced retail prices, it would appear that the consuming public somewhere along the line pays for the rather high mortality rate among retail dealers and the tremendous cost of price wars to the major oil companies." at *p.* 22.

Our State has a long history of gasoline price wars among retail dealers. The Annual Report of the Motor Fuel Division, speaking of the two 1938 acts referred to in this opinion, *i. e.,* amendment to the fair trade act and the act involved in this suit, said:

"The purpose of the act [fair trade amendment] along with the act to regulate the retail sale of motor fuels, was to overcome the existing chaotic state of the retail dealer industry and to assure a living wage to all concerned." at *p.* 23.

The Report of the United States Senate Select Committee on Small Business on Petroleum Marketing Practices in New Jersey (84th Congress, 2d Session 1956; Report No. 2810) declares:

"* * * the State of New Jersey, plagued as it has been since 1950 by an almost chronic price war, was the market in which competitive problems of gasoline retailers were most pronounced." at *p.* 2.

Some of the effects of the "war" were described:

"In general, New Jersey's gasoline retailers have been faring poorly during recent years in maintaining a decent standard of living for themselves and their employees. The witnesses who appeared before your Committee spoke movingly of the economic plight in which dealers found themselves." at *p.* 14.

References followed to various specific examples of the financial distress of operators and their families stemming from the destructive price competition. Included also was testimony of Governor Robert B. Meyner of New Jersey concerning his own personal acquaintance with the problem. He had talked with many dealers who said they were practically bankrupt "because they thought that the price war would only exist for a limited time." He said also:

"They find that they are pumping gasoline for a half a cent, or three-quarters of a cent, or a cent a gallon, and they have worked 12 or 14 or 15 hours a day, and they haven't been able to hire

employees, or, when they do hire employees, they haven't been able to pay them the prevailing wage. I don't think there is any doubt but what the retail dealer has suffered and suffered very much in the process." at *p.* 15.

The Governor spoke also of reports of people driving into stations where prices had been reduced, buying fifty cents worth of gasoline and then blocking the entrance and exit ways. The Committee found one conclusion to be "unavoidable":

"The gasoline price war had reduced the dealers to a desperate financial plight, from which they were unable to extricate themselves. To allow such a situation to continue would be to see many fine small businesses eliminated from the retailing of gasoline in New Jersey." at *pp.* 14–15.

We must assume, particularly in view of the introducers' statements appearing on the bills, the various committee reports and the preamble of the 1952 supplement, *N. J. S. A.* 56:6–2.1 to 2.5, that the Legislature in enacting Section 2(e) had in mind the many problems associated with price wars and various unfair and fraudulent practices engaged in by dealers in selling gasoline to the consuming public. See *Townsend v. Yeomans, supra,* 301 *U. S.,* at *pp.* 451–53, 57 *S. Ct.* 842. Histories similar in kind, although perhaps more pervasive in degree, were recounted at length by the United States Supreme Court in *Nebbia v. People of State of New York, Sunshine Anthracite Coal Co. v. Adkins* and *Townsend v. Yeomans, supra,* all involving aspects of sale price regulation. Such histories are persuasive and aid a court in appraising regulatory legislation, although actual proof thereof cannot be regarded as essential. For example, in *West Coast Hotel Company v. Parrish,* 300 *U. S.* 379, 57 *S. Ct.* 578, 81 *L. Ed.* 703 (1937), which sustained minimum wage for women legislation, the court took judicial notice of many economic factors which would justify the control exercised. Speaking of the absence of specific proof, Chief Justice Hughes remarked that "While in the instant

case no factual brief has been presented, there is no reason to doubt that the State of Washington has encountered the same social problem that is present elsewhere." *Id.,* 300 *U. S.,* at *p.* 399, 57 *S. Ct.,* at *p.* 585. In *O'Gorman & Young v. Hartford Fire Ins. Co.,* 282 *U. S.* 251, 257, 258, 51 *S. Ct.* 130, 75 *L. Ed.* 324 (1931), which concerned the validity of a New Jersey statute regulating fire insurance brokers commissions, Justice Brandeis observed that: "As underlying questions of fact may condition the constitutionality of legislation of this character, the presumption of constitutionality must prevail in the absence of some factual foundation of record for overthrowing the statute. It does not appear upon the face of the statute, or from any facts of which the court must take judicial notice, that in New Jersey evils did not exist in the business of fire insurance for which this statutory provision was an appropriate remedy." See *Serve Yourself Gasoline Stations Ass'n v. Brock, supra.* Finally, as particularly applicable to the present argument of plaintiff, we should reiterate the assertion of that court in *Olsen v. State of Nebraska, supra,* to the effect that it is not necessary for the State to demonstrate factually that evils exist in the retail gasoline business which warrant the control imposed. "In [the] final analysis, the only constitutional prohibitions or restraints which respondents have suggested for the invalidation of this legislation are those notions of public policy embedded in earlier decisions of this Court but which, as Mr. Justice Holmes long admonished, should not be read into the Constitution. [citations omitted.] Since they do not find expression in the Constitution, we cannot give them continuing vitality as standards by which the constitutionality of the economic and social programs of the states is to be determined." 313 *U. S.,* at *pp.* 246–247, 61 *S. Ct.,* at *p.* 865.

From the various reports referred to above relating to the retail sale of gasoline in New Jersey, it may be said that the ban on rebates and discounts from the posted price has not proved as successful as was expected. In this con-

nection it is not amiss to point out that undoubtedly some of the discussion in *Regal Oil v. State, Reingold v. Harper,* and in the Chancery Division opinion in *Sperry & Hutchinson v. Margetts,* cast doubt upon the constitutionality of the act. Removal of those doubts may provide the panacea.

 From all of the above, the conclusion must be reached that *N. J. S. A.* 56:6–2(e) constitutes a reasonable exercise of the police power. Plaintiff has not shown to the contrary; neither is there anything of which we should take judicial notice, nor in the context of the subsection of the statute itself, which negatives the presumption of constitutionality. Freedom to contract with respect to the retail sale price of gasoline does not mean absolute freedom. The constitutional guaranty of such liberty cannot be considered as denying to the legislative branch of the government authority to impose those reasonable safeguards which, in its judgment, are necessary to the public welfare. The liberty is protected against arbitrary restrictions, not prohibitions established in the interest of the community. We find no arbitrary or discriminatory restraint in the present case.

The judgment is affirmed.

HALL, J., concurring in result.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.