102 N.J. Super. 459 (1968)
246 A.2d 150
UNITED STATIONS OF NEW JERSEY (US), A CORPORATION OF NEW JERSEY, AND NICHOLAS DEL SPINA, PLAINTIFFS,
v.
GETTY OIL COMPANY, A DELAWARE CORPORATION, SHELL OIL COMPANY, A DELAWARE CORPORATION, ATLANTIC RICHFIELD COMPANY, A DELAWARE CORPORATION, ALL DOING BUSINESS IN NEW JERSEY; HUMBLE OIL AND REFINING COMPANY, A NEW JERSEY CORPORATION; CLIFTON CREECH, t/a CLIFF'S AUTO SERVICE, INDIVIDUALLY AND AS REPRESENTATIVE OF A CLASS OF RETAIL MOTOR FUEL DEALERS ENGAGING IN SHELL OIL COMPANY'S "AMERICANA" GAME; GEORGE W. SCHUTZ, t/a WERNER'S AUTO SERVICE, INDIVIDUALLY AND AS REPRESENTATIVE OF A CLASS OF RETAIL MOTOR FUEL DEALER'S ENGAGING IN ATLANTIC OIL COMPANY'S "MATCH THE RED BALL" CONTEST; MATTHEW DE ROSA, t/a DE ROSA FLYING A, INDIVIDUALLY AND AS REPRESENTATIVE OF A CLASS OF RETAIL MOTOR FUEL DEALERS ENGAGING IN GETTY OIL COMPANY'S "MAKE MONEY" CONTEST; AND PETER BONAGURA, t/a REDWOOD ESSO SERVICE CENTER, INDIVIDUALLY AND AS REPRESENTATIVE OF A CLASS OF RETAIL MOTOR FUEL DEALERS ENGAGED IN HUMBLE OIL AND REFINING COMPANY'S "WILD CARD TIGERAMA" CONTEST, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided August 1, 1968.
*464 Mr. Donald M. Weitzman for plaintiff Nicholas Del Spina (Messrs. Glucksman & Weitzman, attorneys).
Mr. William P. Reiss for defendant Getty Oil Company (Messrs. Pitney, Hardin & Kipp, attorneys).
Messrs. William Simon and Paul E. d'Hedouville of the District of Columbia Bar, for defendant Shell Oil Company (Messrs. Howrey, Simon, Baker & Murchison, attorneys) and Mr. Verling C. Enteman for defendants Shell Oil Company and Clifton Creech.
Mr. Francis E.P. McCarter for defendant Atlantic Richfield Company (Messrs. McCarter & English, attorneys).
*465 Mr. James J. McLaughlin for defendant Humble Oil and Refining Company (Messrs. McLaughlin, Dawes & Abbots, attorneys).
Mr. Michael D. Loprete for defendant George W. Schutz (Messrs. Mattson, Madden, Polito & Loprete, attorneys).
Mr. John L. Moore for defendant Matthew De Rosa (Messrs. Moore & Howell, attorneys).
Messrs. Robert C. Garofalo and Paul A. Colwell, Jr. for defendant Peter Bonagura (Messrs. Ryan, Foster & Garofalo, attorneys).
MINTZ, J.S.C.
Plaintiff Nicholas Del Spina operates a Mobil filling station at 460 Main Street, Orange, N.J. His complaint alleges that retail service station dealers are conducting certain giveaway contests in violation of N.J.S.A. 56:6-2(f) which provides that:
"It shall be unlawful for any retail dealer to use lotteries, prizes, wheels of fortune, punch-boards or other games of chance, in connection with the sale of motor fuels."
The theory of plaintiff's suit is that defendants, by promoting and conducting contests which he claims are in violation of the law, are engaging in unfair competition to his injury. His complaint seeks injunctive relief against the named major oil and refining companies and against the named retail dealers, individually and as class representatives for service station dealers throughout the State conducting such giveaway contests and selling motor fuels for said named oil companies.
Prior to trial Del Spina moved for summary judgment which was denied. The opinion rendered in connection with the disposition of that motion is reported as United Stations of New Jersey v. Kingsley, 99 N.J. Super. 574 (Ch. Div. *466 1968). Therein I held that plaintiff, as a retail dealer, could maintain a common law action of unfair competition against his competitors if he could prove that their conduct violated N.J.S.A. 56:6-2(f) and was injurious to him. Thus, any possible injunctive relief would be territorially limited to those defendants operating in plaintiff's competitive area; the scope of the alleged classes of retail dealers would be similarly delimited.
Since the filing of my opinion on plaintiff's summary judgment motion, defendants Peter Bonagura and Matthew De Rosa have been joined as parties defendant in the capacities of individuals and class representatives of retailers in the competitive area who conduct giveaways and sell products of the Humble Oil and Refining Company (hereinafter Humble) and Getty Oil Company (hereinafter Getty), respectively. De Rosa purchased a Getty station from Anthony Recchia during the course of the litigation and was substituted for him as a defendant. At the trial the action against defendant Schutz, individually and as class representative for retail dealers in plaintiff's competitive area selling motor fuels distributed by Atlantic Richfield Company (hereinafter Atlantic), was stayed because of his present military service. The complaint of United Stations of New Jersey and the counterclaim filed against it and co-plaintiff Del Spina have been dismissed.
In the approximately 16 months since the filing of the complaint the giveaway contests therein referred to were discontinued for varying intervals and then replaced by other games. Getty's "Flying Aces" was superseded by "Make Money." Atlantic's "Match The Red Ball" was replaced by the current "On The Go." Humble's "Tigerama" was replaced by "Winning Ticket." Shell Oil Company (hereinafter Shell) terminated "Americana" on May 31, 1967 and reactivated it for the period August 25 to November 30, 1967. Its third promotion, "Spell Americana," started February 1, 1968 and terminated the first week in June 1968. Shell represented at the trial that if it suffers competitive *467 losses as a result of this discontinuance, it proposes to start another type of game.
As I noted in my earlier opinion:
"The contests sponsored by the respective oil companies are the same in principle. No contest requires the public to purchase any merchandise as a condition for participation and no retail service station operator is required to conduct a contest sponsored by his oil company. The oil companies sell to willing retail service station operators quantities of contest tickets or slips and supply these dealers with other promotional materials. Although the profusion of the games has given birth to numerous contest forms, generally if a contestant obtains matching tickets or slips he is entitled to a prize. The lesser cash and consumer goods prizes are paid or dispensed by the retail dealer who is reimbursed by his oil company. The larger prizes are paid or dispensed directly by the sponsoring major oil companies. In most instances the distribution of contest slips is restricted to licensed drivers who enter the retailers' premises and ask for them, although some companies instruct their participating retailers to issue slips to any service station visitor who requests them." 99 N.J. Super., at p. 579.
The testimony developed at the trial confirms that observation. Furthermore, participants are required to appear at retail service stations to collect their prizes if they win. Additionally, in some contests one can now become a winner by merely obtaining a single ticket with a winning symbol, and some dealers have apparently arranged for game pieces to be given away at locations other than their own premises. It is undisputed that the various giveaway contests involve no skill on the part of players; winners are determined by pure chance.
On the motion for summary judgment defendants urged that because of the "no purchase necessary" feature of their contests, the contests were not "games of chance" under the intendment of the statute. At trial defendants did not press the point that without consideration  cash or other valuable thing  their contests could not be so classified. The statute of which N.J.S.A. 56:6-2(f) forms a part is entitled "An act to regulate the retail sale of motor fuels," N.J.S.A. 56:6-17. Thus, the purpose of this whole statute *468 is regulation of competitive practices in the retail motor fuel business, and it is from this standpoint that the provision's prohibition of "games of chance" should be viewed. In my earlier opinion (at p. 586) I quoted from 1 Callmann, Unfair Competition, Trademarks and Monopolies (3d ed. 1967), § 31, p. 1056, where the author stated that from a competitive aspect, consideration in a lottery or the like is not only an insignificant element but its absence renders the game device much more effective in attracting attention. For that reason I conclude that despite the "no purchase necessary" feature of defendants' contests, they are "games of chance" within the meaning of N.J.S.A. 56:6-2(f).
Assuming arguendo that consideration is required under N.J.S.A. 56:6-2(f), it must be noted that the definition of a lottery in the criminal Lottery Act, N.J.S. 2A:121-6, does not control the trade regulatory provision at issue. 99 N.J. Super., at pp. 585-586. In requiring the participant to visit the retail dealer's premises, the dealer receives consideration in the expectation that this lure will result in an increase in his motor fuel sales. See Lucky Calendar Co. v. Cohen, 19 N.J. 399 (1955). As will hereinafter appear, this expectation has frequently been fulfilled.
Defendants stress that even if their giveaways are "games of chance," the fact that participants need not purchase motor fuel in order to enter the contests proves they are not operated "in connection with the sale of motor fuels." They argue that the only way to accord meaning to this phrase is to construe N.J.S.A. 56:6-2(f) so that the only illegal giveaways in the motor fuel industry are those in which participation is conditioned upon a sale of motor fuel. Moreover, it is their position that the principal purpose of the giveaway promotions it not to effect immediate increases in retail gasoline sales but to attract prospective customers to the stations where they may be exposed to the service rendered by the respective dealers. If the service rendered the visiting motorist is good, the dealer has a chance to gain a regular customer.
*469 The testimony by Robert L. Berg, Shell district manager for Newark, that the purpose of the games was to stimulate fuel sales, supports plaintiff's allegation that the "no purchase necessary" feature is a mere shield for the fundamental connection of these games with motor fuel sales. The fact that participating dealers were instructed to gauge their requisitioning of game pieces by the number of gallons of gasoline they usually pumped provides still further support of this link. The proofs also indicate that the respective oil companies, at meetings during which the games were introduced to their New Jersey dealers, emphasized the prospective increases in motor fuel sales to be gained through the use of such contests. This same desire of the sponsoring oil companies to rapidly stimulate motor fuel sales is further evidenced in Atlantic's "Dealer's Guide", distributed as instructions for its "Match the Red Ball Game." On page 4 the oil company states to its dealers that its giveaway
"`MATCH THE RED BALL' is designed to produce SUBSTANTIAL INCREASES IN STATION TRAFFIC AND VOLUME after the first 2-3 introductory weeks.
Experience indicates that you can expect increases of AT LEAST:
 50% IN TRAFFIC
 40% IN GALLONAGE"
And on page 5:
"In this promotion running out of envelopes means stopping the promotion temporarily in your station(s). In all probability, customers will go elsewhere and the lost momentum will be very difficult to regain." (Emphasis supplied)
I am satisfied that the principal purpose of the respective giveaway contests is to effect for the participating dealer an immediate increase in motor fuel sales, to the detriment of his competitor's business.
The experience of dealers with the games, especially at their inception in 1966 and 1967, confirmed these expectations of the games' direct and immediate effect on motor fuel *470 sales. Berg of Shell testified that at the outset of the games certain of his company's dealers enjoy gallonage increases up to 60%, in good measure caused by the games. Representatives for the other oil companies also testified to increases in gallonage when the games are being conducted by their dealers. Leo H. Bilse, a Shell dealer in Orange, testified that on several occasions motorists drove into his service station at a time when he was not sponsoring a giveaway contest and that upon observing that his competitor across the street advertised a game, they left his station without making a purchase and drove into the competitor's station where they bought motor fuel. Even defendant Clifton Creech, a Shell dealer in West Orange, admitted that when a dealer is not using a game promotion, some of his customers will leave for a station that is using one.
Thus, to some degree the goal of increasing sales set for these games has been accomplished  especially when competitors did not also offer offsetting giveaways  because of the apparent affection of a goodly segment of the public for the games and their willingness to patronize only dealers who conduct them. However, when all or most of the major oil companies sponsor such contests, the games have a somewhat neutralizing effect. When a major oil company discontinues its game, it experiences losses and is competitively forced to reinstitute a giveaway contest. The experience of the individual dealer, who can only use a game when his supplier offers him one, is generally to the same effect.
The history of the games reveals that both suppliers and dealers have become involved in the dilemma caused by giveaways that trade regulatory statutes are intended to obviate. 1 Callmann, op. cit., § 31, p. 1057. Berg frankly admitted that Shell has no desire to run these giveaway contests  that it does so strictly as a defensive measure to avert sales losses it might incur if it did not operate a game. He also stated that the avergae retail dealer is competitively forced to conduct the giveaway contest lest he suffer a loss *471 of business to those dealers who do so. This observation was confirmed by Francis J. Murphy, an Atlantic dealer in West Orange. He testified that though he considered that the "games are a disgrace to the oil industry" and had declined Atlantic's second contest, he was "hurting for gallonage" because of his competitors' giveaways and was impelled to accept Atlantic's third game offering.
Defendants' reliance upon the "no purchase necessary" feature as a bar to a finding that the games are used "in connection with the sale of motor fuels," is untenable. In addition to proof of the purpose and result of the games, the testimony by dealers, including defendants Creech and Bonagura, was that the occasions were rare, or relatively few, when game pieces were distributed by them to non-purchasers of motor fuel. Furthermore, this development was probably anticipated by the sponsoring oil companies. For instance, on page 6 of Atlantic's "Dealer's Guide", dealers were told:
"While it is essential that every station visitor receive an envelope  regardless of whether or not they make a purchase  don't worry about giving out a lot of envelopes to people who might not intend to do business with you. Experience indicates that the occasional person who stops in for a `free' envelope will probably be back as a customer within the week."
On page 7 the dealer is advised to pass out envelopes containing the game piece to nondrivers, including children, "But don't be concerned about this. It won't happen often and it is good business in the long run. Children generally show envelopes to their praents [parents] and you can expect to see some of these parents at the pumps."
Getty points to evidence that some of its dealers have distributed game pieces at such places as parking lots, rather than at their premises, for the purpose of showing the lack of "connection" between the games and motor fuel sales. A circular, to which is attached an envelope containing two game pieces, urges recipients to "HURRY! TAKE THIS CIRCULAR WITH YOU TO YOUR PARTICIPATING *472 FLYING A DEALER" to obtain a matching ticket or a prize. The extent of these promotional activities away from the service stations was not indicated, and I cannot assume that it is of any substantial nature.
I am satisfied that defendants' games as presently used at the service stations, notwithstanding the "no purchase necessary" rule, constitute "games of chance" inextricably connected with the sale of motor fuels. N.J.S.A. 56:6-2(f), part of an enactment designed to regulate competitive practices in the motor fuel industry, generally seeks to discourage such competitive devices of temptation. By prohibiting these, the legislation protects members of this volatile trade from being forced to accede to the use of these potent, but ethically controversial, competitive devices. As noted earlier, the absence of a requirement of a purchase for participants makes these games of chance even more effective as a trade diverting technique. The fact that participants need not pay in order to participate in a game of chance did not stop the court in State v. Berger, 126 N.J.L. 39 (Sup. Ct. 1941), from affirming a motion picture theatre operator's conviction under the then prevailing Gaming Act, R.S. 2:135-1 (now N.J.S. 2A:112-1 et seq.). The court said:
"In reaching the stated result we have not overlooked the fact that some 25 or 30 persons were permitted to enter the lobby and play the game without having purchased a ticket of admission. On the contrary, our result is strengthened thereby. For however ingenious, the stated circumstance is nothing other than a subterfuge, a brazen artifice employed for the clear purpose of thwarting the enforcement of the criminal law. The law reaches beyond the outer form and takes hold of the substance of the thing in issue, and consequently no dressing, however adroit, can make legal that which is illegal." (at p. 43)
Accord, Furst v. A. & G. Amusement Co., 128 N.J.L. 311, 314 (E. & A. 1942). See also Featherstone v. Independent Service Station Ass'n of Texas, 10 S.W.2d 124 (Tex. Civ. App. 1928); Glover v. Malloska, 238 Mich. 216, 213 N.W. 107, 52 A.L.R. 77 (Sup. Ct. 1927); Jones v. Smith Oil & *473 Refining Co., 295 Ill. App. 519, 15 N.E.2d 42 (App. Ct. 1938).
I reject the argument that to include "no purchase necessary" giveaways under the ban of N.J.S.A. 56:6-2(f) would render nugatory the so-called plain meaning of the statutory phrase "in connection with sale of motor fuels." This court, like that in State v. Berger, supra, will not be diverted in its construction of the statutory language by mere window-dressing, such as the "no purchase necessary" feature, and will not permit such an element, insignificant in theory and practice, to thwart the statutory purpose.
Defendants argue that somewhat similar promotions have been conducted over the years with approval of the administrative agency charged with the enforcement of the subject statute, and that I should respect this approval. Administrative construction of the relevant statute is entitled to great weight, especially when such construction is substantially contemporaneous with the enactment of the statute and is followed for many years. Essex County Retail Liquor Stores Ass'n v. Newark Board, etc., 64 N.J. Super. 314 (App. Div. 1960); Pringle v. N.J. Dept. of Civil Service, 45 N.J. 329 (1965). However, where that interpretation conflicts with the court's view of the plain meaning of the language used and the statutory purpose, the court should not hesitate to reject it. Safeway Trails, Inc. v. Furman, 41 N.J. 467, 483 (1964); Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 528 (1964).
In reaching my conclusion that the giveaway contests are violative of N.J.S.A. 56:6-2(f), I am also mindful of the First Assistant Attorney General's opinion of August 1, 1966 given to the Motor Fuels Tax Bureau of the Division of Taxation to the effect that the giveaway promotions "do not appear to be violations of N.J.S.A. 56:6-2(f). All of the promotions as presently undertaken provide that a participant need not purchase motor fuel. You have not furnished any facts or reports which would indicate a situation to the contrary." However, he further stated *474 therein that "The applicable law in this regard is not clear or free from doubt * * *."
The First Assistant Attorney General's opinion is, of course, entitled to consideration, but as above indicated he expressed his opinion with some reservation and did not have the benefit of the voluminous testimony presented in this case as to the use of the games. Under all the stated circumstances and with due deference for their views, I reject the construction of the subject statute as made by the administrative agency and the First Assistant Attorney General.
Getty urges that N.J.S.A. 56:6-2(f) is arbitrary, discriminatory and unreasonable, in violation of the equal protection and due process clauses of the Fourteenth Amendment of the United States Constitution and N.J. Const. (1947), Art. I, par. 1. It is asserted that this subsection bears no reasonable relation to the purpose for which the act (N.J.S.A. 56:6-1 to 17) was adopted, unless it is interpreted to prohibit only those promotions which require a purchase of motor fuel for participation. Furthermore, Getty argues that insofar as this subsection singles out the retail motor fuel industry, it is unreasonable, unfair and discriminatory.
Initially, it is to be observed that there is a strong presumption of constitutionality of the statute, and the party asserting invalidity must overcome that presumption. Where regulation of a particular type of business is involved and the allegation of unconstitutionality is predicated upon a charge of discrimination, courts uniformly sustain the law if any reasonably conceivable basis exists for separate treatment and if the treatment is not arbitrary or unreasonable. Fried v. Kervick, 34 N.J. 68 (1961); Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934).
It is argued that the essential purpose of N.J.S.A. 56:6-2 is to prevent destructive price wars, and that it is upon this premise that the constitutionality of subsection *475 2(e) was upheld in Fried v. Kervick, supra. Subsection 2(e) forbids the use of "rebates, allowances, concessions, or benefits" so as to permit sales below posted prices. Getty contends that subsection 2(f) prohibits another possible means of selling below posted prices, through the use of lotteries and games of chance, and that this subsection has no meaning unless it is construed to forbid giveaway contests only where participation in the games is conditioned upon a purchase of motor fuels. It asserts that if subsection 2(f) is not so construed, then "in connection with the sale of motor fuels" has no meaning and the subsection loses all reasonable relation to the statutory purpose of the legislation, namely, the prevention of price wars. However, in enacting the legislation the Legislature had in mind not only the many problems associated with price wars but also the "various unfair and fraudulent practices engaged in by dealers in selling gasoline to the consuming public." Fried v. Kervick, supra, at p. 81. As already observed, the legislation of which N.J.S.A. 56:6-2(f) is a part, is entitled "An act to regulate the sale of motor fuels." N.J.S.A. 56:6-17. Hence, the title suggests that the statute is regulatory in nature, and not merely concerned with price alone to the exclusion of all other factors. Subsection 2(g) and (h) of the subject statute are not concerned with the problem of price wars, but in setting other standards of fair competition. Likewise, the Legislature has determined that giveaway contests constitute an unfair means of competition by retail dealers, and in its wisdom by subsection 2(f) has banned what it considers an unwholesome and perhaps destructive competitive practice.
The evidence indicated that various giveaway promotional contests are used in several other industries. It is asserted that by singling out the retail motor fuel industry, N.J.S.A. 56:6-2(f) is unreasonably discriminatory. Substantially the same argument was made and rejected in Fried v. Kervick, where the court held that the motor fuel industry was of sufficient importance to be the subject of specific legislation. The Legislature has the authority to *476 regulate an evil associated with any business which for the public good justifies the particular measure of control. "The Legislature is presumed to know the needs of the people and it may draw distinctions based upon degrees of evil without being arbitrary." Fried v. Kervick, supra, at p. 75. The court there (at page 75) made the further observation that "N.J.S.A. 56:6-2(e) within its own framework is not discriminatory; it applies equally to all retail gasoline dealers operating in the State." The same is true for N.J.S.A. 56:6-2 (f). I conclude that subsection 2 (f) constitutes a reasonable exercise of the police power.
Defendants further argue that plaintiff should be denied equitable relief since his testimony was in several areas incredible, and because he may have threatened a witness respecting his proposed testimony. Plaintiff's testimony was occasionally contradicted during the course of trial and his credibility on some issues may have been impaired, but not to the extent that should lead me to conclude that he is wholly unworthy of belief and so unclean as to be undeserving of equitable relief. The testimony respecting the alleged threats to the witness Robert E. Pines, Jr. was pure hearsay and of no probative force. Hence, I conclude that plaintiff's conduct should not debar him from equitable relief.
As was noted earlier, plaintiff's right to injunctive relief against his competitors for their unfair competition is conditioned upon his proving that their conduct of the giveaway games injured or are likely to injure him. 99 N.J. Super., at pp. 587-588. About two years have passed since the inception of the games, so that if these games were to injure plaintiff's business, loss would already have appeared. Plaintiff's proofs show that before he participated in Mobil's initial giveaway contest in the fall of 1966, he was pumping an average of 26,000 to 27,000 gallons of gasoline monthly. During the period of his participation, he experienced an increase in sales. Upon his discontinuance of the game, plaintiff's gallonage declined, and the trend continued *477 downward while competitors conducted games to where his gallonage has leveled to an average of approximately 22,000 gallons monthly.
Defendants attempt to rebut this prima facie showing of loss due to the games by contending that plaintiff's deficient methods of operation, increase of his gasoline prices and other changes of conditions are just as likely causes of plaintiff's recent loss of gallonage. It is also charged that plaintiff has suffered no injury during this period because his overall business at the Main Street location, which includes a car wash and trailer rental service, has shown increased profits.
There has been no substantial change in plaintiff's operation of his service station or in the quality of his service in the past two years. Also his overhead has remained the same. Although plaintiff did raise his retail price of gasoline, so did his competitors, and throughout the past two years his prices have been consistent with theirs. Hence, it cannot be said that plaintiff's price increase in any way contributed to his loss of gallonage. As for his gain in profits while losing gallonage, it may be inferred that to some extent his gallonage loss deprived him of an opportunity to earn even greater profits.
Since plaintiff's complaint against the use of the giveaways is grounded on a common law theory of unfair competition, the injunctive process must only issue against those defendants who wrongfully compete with him or those who directly aid such wrongful competition. Defendants Bonagura, a Humble dealer, Creech, a Shell dealer, and De Rosa, a Getty dealer, argue that they cannot be enjoined because they are not plaintiff's competitors
Bonagura's service station is situate at 486 Prospect Avenue, West Orange, N.J., just beyond a 1 1/4-mile radius from plaintiff's station. He testified that when the Humble dealer located on Main Street, one block from plaintiff's station, stopped using a Humble contest and he continued to conduct one, his business increased. Bonagura formerly also operated a Shell station on Main Street, one block from *478 plaintiff's, where he says he attracted customers from the "top of the hill" in West Orange where he is presently located. Commuter traffic patterns tend to corroborate the inference that there is some competition for trade between stations in West Orange at the "top of the hill" and those in Orange in the "valley." It appears that local as well as transient trade may have bypassed or is likely to bypass plaintiff's station in order to obtain a game piece at Bonagura's present station. Therefore, he must be deemed a competitor of plaintiff.
The service station of defendant Creech is located at 1 Harrison Avenue, West Orange, adjacent to the Montclair line, a distance of perhaps two miles from plaintiff's location. Some traffic to the business centers of Orange and Newark may likely pass or come reasonably close to the Creech station as well as plaintiff's. The sharing by Del Spina and Creech of a Mr. De Gange, a valued customer of Creech, for a period from 1965 through 1967, lends further support to a finding that they are competitors.
Defendant De Rosa's service station is located on the corner of Scotland Road and Central Avenue in Orange, about one mile from paintiff's station. Motor traffic is to some extent common to both stations, and this defendant must be deemed plaintiff's competitor.
Therefore, defendants Bonagura, Creech and De Rosa, as individual station operators, are enjoined from unfairly competing with plaintiff by using the games.
Undoubtedly, there are service stations supplied by defendant oil companies closer to plaintiff which conduct giveaways that afford keener competition to plaintiff than do those of defendants Bonagura, Creech and De Rosa. Presumably many of these dealers are fellow members with Del Spina in United Stations of New Jersey, originally a co-plaintiff in this action, and the reluctance to join them as defendants is understandable. Plaintiff tried to employ the technique of the class suit  naming classes of Getty, Shell, Humble and Atlantic dealers and De Rosa, Creech, Bonagura *479 and Schutz as class representatives  to effectuate an injunction against all the unnamed dealers for these oil companies located in his undetermined competitive area. Whether the individual defendant dealers are properly designated class representatives was left unresolved on the motion for summary judgment. This is a spurious class action, and so the class suit device fails to achieve the result sought by plaintiff. The rights sought to be enforced by plaintiff against the respective classes are "several and there is a common question of law or fact affecting the several rights and a common relief is sought." R.R. 4:36-1(c). As stated in 2 Schnitzer and Wildstein, N.J. Rules Service, p. A IV-1136, 1137:
"* * * [a judgment in a spurious class action] concludes only those who come or are brought into the proceeding, individually or by intervention. Zaleski v. Local 401, 9 N.J. Super. 206, 209 (App. Div. 1950), citing Professor Moore's description of such proceedings as `an invitation to become a fellow traveller in the litigation, which may or may not be accepted' by intervention. See N.J. Used Car Trade Ass'n v. Magee, 1 N.J. Super. 371 (Ch. Div. 1948), where used car dealers and an association of such concerns sought an injunction against enforcement of an unconstitutional statute * * *, the injunction granted was limited to the persons who appeared as plaintiffs * * *."
See also Conover v. Packanack Lake Country Club, 94 N.J. Super. 275, 279 (App. Div. 1967). Hence, no injunction could have bound any member of the respective classes Bonagura, Creech and De Rosa were alleged to represent and no injunction will issue against these three dealers as class representatives.
Defendant major oil companies stress that N.J.S.A. 56:6-2(f) applies only to retail dealers and that they are not retail dealers or agents for retail dealers. They refer to my earlier opinion in which I indicated that injunctive relief if granted to plaintiff against his competing neighboring retailers would give him the complete relief to which he would be entitled. But, after hearing the testimony and reviewing the applicable law, I am impelled to the conclusion *480 that for his most effective relief plaintiff is entitled to an injunction against the defendant major oil companies.
The testimony indicated that the dealer exercises complete control over his own service station business and that his participation in the games from a legal point of view is purely voluntary. Realistically, however, as Berg testified, it has been thought a competitive necessity for one major oil company to sponsor such giveaway contests to combat another's, and for the average dealer to participate in the game promoted by his oil company. The dealer obtains the game pieces from his oil company at charges varying from one cent to two cents a piece. The oil company supplies him with free advertising material for the game to be displayed at the dealer's service station. As already noted, Getty, Shell and Humble stations give minor cash prizes to the winners for which the oil companies reimburse the dealers. Where the prize exceeds $5 or $10, as the case may be, an oil company representative for Getty or Humble appears at the dealer's service station and personally presents the winner with a company check. Shell apparently remits its check to the dealer for delivery to the winner. A supplier of the Atlantic contest's major prizes delivers them to the dealer and is in turn reimbursed by Atlantic. The oil companies' indispensable involvement in the giveaway contests is obvious. Although the statute, N.J.S.A. 56:6-2(f), upon which plaintiff's unfair competition claim is based, is directed against only retailers, it is apparent that defendant oil companies are in fact the moving force in the violation of the statute and the unfair competition against plaintiff. Clearly, then, such activities in the conduct of the giveaway games in plaintiff's competitive area should be enjoined. Accordingly, the most appropriate relief against defendant oil companies it to enjoin them from the further issuance of game pieces or from participating in any way in the issuance of game pieces to the service station dealers within plaintiff's competitive area.
It is difficult to define plaintiff's competitive area with any degree of precision. The testimony indicated that some motorists *481 will by pass a service station not using a game and go out of their way to patronize a service station dispensing one. There were varied estimates given respecting plaintiff's competitive area, but it would appear that his essential competition is confined to the municipalities of Orange and West Orange. The oil companies will be enjoined from supplying retail dealers with game pieces in those municipalities.
In reaching this conclusion, I have considered the special reasons advanced by Atlantic why it should not be enjoined. It urges that Del Spina in his deposition testified that he could not specifically ascribe any of his loss of business to Atlantic's game. At the trial Del Spina testified that he could not pinpoint his losses to any one game, since he does not know to which service stations his customers have been diverted. There are Atlantic service stations located in plaintiff's competitive area. Hence, it is likely that plaintiff has lost and will continue to lose some patronage to these service stations using Atlantic's games. Atlantic also contends that it should not be enjoined because there is no class representative defendant for its dealers presently before the court. But as already noted, no injunction will issue as against any class representative for any oil company. Furthermore, there was testimony respecting Atlantic's direct involvement and participation in the contests with its dealers. Thus Atlantic is in the same position as the other defendant oil companies, and will be subject to the same injunctive process to the extent indicated.
I am mindful that several oil companies and their retail dealers, which are presently sponsoring and using giveaway contests in plaintiff's competitive area, are not defendants in this litigation. As a consequence of this deficiency, and the limited injunctive relief granted, many dealers may continue to use the games to the disadvantage of those enjoined, or to the disadvantage of those dealers in Orange and West Orange who no longer can obtain game pieces. I am, however, hopeful that this decision respecting the illegality of these games of chance will quickly lead to uniform respect for, and enforcement of, the law.