41 N.J. 220 (1963)
195 A.2d 626
HUDSON COUNTY NEWS COMPANY, INC., A DOMESTIC CORPORATION, PLAINTIFF-APPELLANT,
v.
ARTHUR J. SILLS, AS ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, BRENDAN T. BYRNE, AS PROSECUTOR OF ESSEX COUNTY, JAMES A. TUMULTY, JR., AS PROSECUTOR OF HUDSON COUNTY, AND THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
The Supreme Court of New Jersey.
Argued October 22, 1963.
Decided December 2, 1963.
*222 Mr. Julius Kass of the New York Bar argued the cause for the appellant (Mr. Jacob H. Bernstein, attorney).
Mr. Arthur W. Brinkmann, Deputy Attorney General, argued the cause for the respondents (Mr. Arthur J. Sills, Attorney General of New Jersey, Attorney pro se and for the respondent State of New Jersey; Mr. Brendan T. Byrne, Prosecutor of Essex County, Attorney pro se, Mr. Peter Murray, Assistant Prosecutor of Essex County, of counsel; Mr. James A. Tumulty, Jr., Prosecutor of Hudson County, Attorney pro se, Mr. Harold Ruvoldt, Assistant Prosecutor of Hudson County, of counsel).
*223 The opinion of the court was delivered by JACOBS, J.
The Law Division entered a judgment declaring Chapter 174 of the Laws of 1962 (N.J.S. 2A:170-77.2a, 77.2b) to be constitutional. The plaintiff appealed to the Appellate Division and we certified before argument there.
In 1960 a joint legislative commission was created to study and investigate obscenity in certain publications and to report its findings together with legislative proposals. In due course the commission submitted its final report. See N.J. Legislature, Joint Commission to Study Obscenity in Certain Publications, Final Report (1962). It made a conclusional finding that the "sale of obscene and pornographic materials constitutes a serious threat to the ethical and moral well-being of the youth of the State and thus creates a clear and present danger to all its citizens." It also made several legislative recommendations. Firstly, it recommended that the definition of obscenity expressed in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), be incorporated in Chapter 115 of Title 2A of the New Jersey Statutes. This was done by the enactment of Chapters 165 and 166 of the Laws of 1962 (N.J.S. 2A:115-1.1; N.J.S. 2A:115-3.4). Secondly, it recommended that there be statutory authority for the use of a limited injunction against the sale of obscene materials. This was provided for in Chapter 166 of the Laws of 1962 (N.J.S. 2A:115-3.5). Thirdly, it recommended that, in order to strengthen existing legislation dealing with tie-in sales (N.J.S. 2A:115-3.1; cf. N.J.S. 2A:170-77.2), "the shipment by a distributor of any publication not previously ordered by name in writing by the newsdealer should be declared a disorderly act." Assembly Bill No. 492 was introduced to implement this recommendation. The introducer's statement set forth the purpose of the bill as being to relieve retailers who sell newspapers, magazines, periodicals, pocket books and the like, of the burden of handling and storing "unwanted materials." It also noted that the bill was intended to place the responsibility for handling "objectionable material" upon the retailer since he will have to order it and, *224 "at the same time, to prevent distributors from disseminating the increasing supply of obscene publications for which they claim no responsibility."
The bill passed both the Assembly and the Senate but was conditionally vetoed by the Governor. In his veto message, the Governor expressed the view that while efforts designed to eliminate obscenity should be supported, care must be taken to insure that those efforts do not infringe on the constitutional right of free expression. He considered that the bill as passed was unduly broad and would seriously hamper the distribution of all publications whether obscene or not, and he voiced the thought that the evils aimed at by the Legislature could be dealt with effectively without impairment of any of the constitutional freedoms. He suggested that the bill be altered to permit a distributor to deliver publications to a retailer as theretofore, except where the retailer has given written direction that a particular publication shall not be sent; in such event, the distributor would be obliged to honor the direction and if he failed to do so the retailer would be enabled to notify him to remove, promptly and without charge, the unordered and unwanted publication under penalty of law. The Governor's suggestion was adopted by the Legislature and the altered bill, as passed and approved by the Governor, became Chapter 174 of the Laws of 1962. It reads as follows:
"1. No person, firm or corporation engaged in the business of distribution of books, magazines or publications of any kind to retail dealers, after notification in writing by a retail dealer not to send or deliver to such dealer any book, magazine or other publication, shall send or deliver to such dealer such book, magazine or other publication.
2. Any person, firm or corporation which fails to comply with the provisions of section 1 of this act, after oral or written notification of such failure to comply by a retail dealer, shall forthwith remove from the possession of such dealer the book, magazine or other publication which was improperly delivered without cost or charge to the dealer. Any person, firm or corporation failing or refusing to remove such publications by the end of the second business day following notification of improper delivery shall be a disorderly person and *225 shall be subject to a fine of not less than $500.00 or imprisonment for 30 days or both."
After the passage of the law, the plaintiff received a letter from the Hudson County Prosecutor's office inviting it to attend a conference where the new laws relating to "obscene publications and the sale and distribution of all magazines and publications" would be considered. At that conference the representative of the prosecutor stated that his office would immediately prosecute any violations of Chapter 174. Similarly the Chief of Police of East Orange, Essex County, addressed a letter to newsdealers, citing Chapter 174 and requesting that violation by any distributor be called to his attention so that action might be taken forthwith. Thereafter the plaintiff filed a petition in the Law Division of the Superior Court, naming the Attorney General and the Prosecutors of Hudson and Essex Counties as defendants, and seeking a declaration that Chapter 174 is unconstitutional. The petition alleged that the plaintiff is a wholesale distributor of newspapers, magazines, paperback books and other publications and does business in the State of New Jersey including Hudson and Essex Counties; it distributes publications to over 1500 retail dealers and its sales amount to $6,000,000 annually; its policy has always been to refrain from delivering any title or titles "if so requested by any dealer"; its practice is "to make a pickup once every week of all returns from retail dealers"; and, if it were required to arrange for the pickup of particular unwanted publications as provided by Chapter 174, it would be subjected to additional expenditures and its present method of distribution would be rendered "economically unfeasible."
The petition sought a preliminary injunction; and an order to show cause why such relief should not be granted was issued. Answers were filed by the defendants and the order to show cause came on for hearing before Judge Fusco. At that time counsel agreed that there were no material factual disputes and that the matter could be disposed of as though on final hearing. No question was presented as to the *226 suitability of the proceeding which was under the Declaratory Judgments Act. N.J.S. 2A:16-50 et seq.; Lucky Calendar Co. v. Cohen, 19 N.J. 399, 408-409 (1955). After hearing argument, the court determined that the statute is constitutional and a judgment to that effect was entered. In support of its appeal, the plaintiff advances the same three points which were rejected below. It contends that Chapter 174 (1) imposes "an arbitrary and oppressive restriction on a lawful business" and thereby denies due process, (2) impairs "the constitutional protection of freedom of the press," and (3) violates "the constitutional guarantee of equal protection of the laws."
In dealing with statutory enactments we seek their purpose and effect and in our search we freely avail ourselves of legislative history. See N.J. Pharmaceutical Ass'n. v. Furman, 33 N.J. 121, 130 (1960); Lloyd v. Vermeulen, 22 N.J. 200, 206 (1956). Here the history clearly discloses the evils aimed at and the efforts to deal with them within constitutional limits. There is no doubt that the original bill was viewed by its sponsors as an additional weapon in the arsenal against obscenity. But there is equally no doubt that the bill, as finally enacted, is not confined to and does not turn on any finding of obscenity. It provides that when a distributor sends a particular publication of whatever nature to a retailer, despite earlier written direction to the contrary, the retailer may notify the distributor that he wants it picked up and, in such event, the distributor must do so promptly. Absent any statute, elementary business moralities and decencies would require ready compliance by the distributor; the question before us is whether, in the circumstances at hand, the placing of the authority of the State behind those moralities and decencies violates any constitutional inhibitions.
In its first point, the plaintiff contends that even when viewed strictly as a business regulation, Chapter 174 violates the due process clause. It acknowledges that the State has general police power to impose business regulations but it stresses that a valid exercise of that power requires (1) that *227 there be a substantial relation between the regulation and the protection of the public health, safety, morals or general welfare, and (2) that the means employed be reasonable and not arbitrary, citing Reingold v. Harper, 6 N.J. 182, 191-192 (1951); N.J. Good Humor, Inc. v. Board of Com'rs of Borough of Bradley Beach, 124 N.J.L. 162, 168 (E. & A. 1940); Regal Oil Co. v. State, 123 N.J.L. 456, 460-461 (Sup. Ct. 1939). The respondents do not dispute these requirements but urge that they are fully satisfied here. They note that when unwanted publications are delivered to the retailer he is not only burdened with problems of handling and storage and fire hazards, but is also placed under financial burden since he is charged upon receipt of the publications and is not credited until their return. They might also have noted that continued receipt and possession by the retailer of the unwanted publications might place him in jeopardy of arrest by police authorities where the publications are deemed to have crossed the border into obscenity.
The State's police power is admittedly comprehensive; within wide outer limits it may be invoked by the Legislature whenever it deems it necessary for the protection of the public health, safety, morals or general welfare. Reingold v. Harper, supra, 6 N.J., at p. 194; Fried v. Kervick, 34 N.J. 68, 74 (1961). In our State, as elsewhere, the general welfare concept has received broad definition. Pierro v. Baxendale, 20 N.J. 17, 28 (1955). When subjected to judicial review, business restrictions imposed by statute under the police power are surrounded by strong presumptions of constitutional validity. Fried v. Kervick, supra, 34 N.J., at p. 74; Gibraltar Factors Corp. v. Slapo, 23 N.J. 459, 463 (1957). With the aid of these presumptions, this court has over the years rejected many due process attacks on business regulations which were infinitely more far-reaching than those in Chapter 174. See Reingold v. Harper, supra, 6 N.J. 182; Family Finance Corp. v. Gaffney, 11 N.J. 565 (1953); Abbotts Dairies v. Armstrong, 14 N.J. 319 (1954); Lionel Corp. v. Grayson-Robinson Stores, 15 N.J. 191 (1954); *228 National City Bank of New York v. Del Sordo, 16 N.J. 530 (1954); Fried v. Kervick, supra, 34 N.J. 68; Gibraltar Factors Corp. v. Slapo, supra, 23 N.J. 459; American Budget Corp. v. Furman, 67 N.J. Super. 134 (Ch. Div. 1961), aff'd, 36 N.J. 129 (1961); Jones v. Haridor Realty Corp., 37 N.J. 384 (1962).
In Reingold v. Harper, supra, the court dealt with a statute which forbade retail gasoline dealers from operating their stations on a self-service basis. The legislation had been sponsored by competitors of self-service operators who advanced safety as well as economic considerations. In sustaining the legislation, this court through Justice Heher noted that prohibition of the self-service device as a means of distributing gasoline was permissible if the Legislature could "reasonably conceive that method to be dangerous to the public health and safety." 6 N.J., at pp. 195-196. In invoking the various presumptions in favor of constitutional validity, he noted that factual support for the legislative judgment was to be presumed and that, in the absence of a showing to the contrary, the court would assume that the measure rested "upon some rational basis within the knowledge and experience of the Legislature." 6 N.J., at p. 196. Cf. Harvey v. Essex County Board of Freeholders, 30 N.J. 381, 390 (1959); United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234, 1241 (1938).
In Fried v. Kervick, supra, an attack was made on a statutory provision which prohibited the granting of any rebate or other allowance "so as to permit any person to obtain motor fuel from the retail dealer below the posted price." The attack was rejected in an opinion by Justice Francis which noted that the police power is incapable of precise definition and limitation and that its boundaries expand to permit regulation of "an evil associated with any business which for the public good justifies the particular measure of control." 34 N.J., at p. 75. Reference was also made to the oft-repeated judicial expressions that the Legislature may be presumed to know the needs of its people and may draw distinctions based *229 upon degrees of evil. Ibid. Townsend v. Yeomans, 301 U.S. 441, 451, 57 S.Ct. 842, 81 L.Ed. 1211, 1219 (1937); Two Guys From Harrison, Inc. v. Furman, 32 N.J. 199, 229 (1960).
The approach in Reingold v. Harper and Fried v. Kervick, was recently applied to sustain a New Jersey statute which prohibited persons from engaging in the debt adjusting business. See American Budget Corp. v. Furman, supra, 67 N.J. Super. 134, 36 N.J. 129. The court's opinion stressed that presumably the Legislature was aware of the dangers of fraud and abuse in the field and concluded that prohibition rather than regulation was the proper remedy. Whether the best remedy had been chosen was held not to be a matter for the court's concern so long as it was reasonably related to the evils at hand. Although the New Jersey case did not reach the United States Supreme Court, that court did pass on a similar Kansas statute. See Ferguson v. Skrupa, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963). It held that the Kansas Legislature was free to decide for itself that a statute was needed to deal with the business of debt adjustment and that the Kansas enactment did not violate the due process clause. In his opinion, Justice Black pointed out that the Supreme Court would not sit as a superlegislature to weigh the wisdom of the legislation and that it would refuse to go back to earlier days when business regulations were stricken because they were deemed "unwise, improvident, or out of harmony with a particular school of thought." 372 U.S., at p. 731, 83 S.Ct., at p. 1032, 10 L.Ed.2d, at p. 98. See Williamson v. Lee Optical of Okla., 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563, 572 (1955).
We likewise shall not sit as a superlegislature or concern ourselves with the wisdom or policy underlying the statute. Our only function is to determine whether the Legislature, by its passage of Chapter 174, exceeded the broad limits of its constitutional power. It was concerned with obscenity and had undoubted power to deal with the subject. See State v. Hudson County News Co., 35 N.J. 284 (1961); cf. Roth v. *230 United States, supra, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498. In its study it determined that prevailing distribution practices unduly diluted responsibility between the distributor and the retailer and imposed an unfair burden and jeopardy upon the retailer. The Legislature sought to curb these evils[1] in the public interest and the means it chose were in no sense unreasonable or arbitrary; indeed they were minimal in their restrictive nature.
Section 1 of Chapter 174 simply provides, without penalty, that the distributor shall not send any particular publication to the retailer where he has received written direction from the retailer to the contrary. That such should be the policy of distribution may hardly be gainsaid; the plaintiff's own complaint states that its policy has always been to refrain from delivering any particular publication, if so requested by the retailer. Section 2 provides that if the distributor has sent a publication to the retailer despite written directions to the contrary, the retailer may notify him of that fact, in which event the distributor shall forthwith pick up the publication without charge. Here, again, it may not be disputed that such should be the policy and the plaintiff's own complaint asserts that its practice is to pick up returns although not as promptly as called for by the statute.
The requirement of promptness is a fair one and the fact that its imposition may compel the plaintiff to alter its private business practices cannot serve to impair the constitutional validity of the statute. The plaintiff contends that the *231 requirement of removal within two days is oppressive in that it would apply even where it "inadvertently or by some act completely beyond its control" fails to effect its pickup. At oral argument the State disavowed any legislative intent to punish for inadvertence and agreed that the statute should be construed to apply only to willful failures to remove within the allotted time. This construction, which we now adopt, is consistent with recent pronouncements which have justly sought to avoid the imposition of punishment for innocent default. See State v. Hudson County News Co., supra, 35 N.J., at p. 293; cf. State v. Schlueter, 127 N.J.L. 496, 499 (Sup. Ct. 1941).
In the light of the presumptions of validity and the cited authorities, we have no hesitancy in rejecting the plaintiff's first point that Chapter 174 imposes an arbitrary restriction on a lawful business and thereby deprives the plaintiff of due process. We come now to its second point under which it asserts that the statute violates the constitutional protection of freedom of the press, citing cases such as Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); Marcus v. Property Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); and Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). These decisions evidence the great breadth of protection which is properly afforded to the distribution of publications; however, they contain nothing which indicates any constitutional infirmity in Chapter 174.
In Talley a divided court struck down a municipal ordinance making it a criminal offense to distribute handbills which did not contain the names and addresses of the persons who prepared or sponsored them; the majority's solicitude for anonymity in the distribution of handbills has no relation to any problem presented by Chapter 174. It may be noted that no reference was made in the court's opinion to Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 *232 (1951),[2] which rejected an attack on an ordinance prohibiting uninvited house-to-house solicitation of magazine subscriptions, thus upholding a far greater restraint upon the free flow of publications than anything envisioned in the plaintiff's argument here. See Konigsberg v. State Bar of California, 366 U.S. 36, 50-52, 81 S.Ct. 997, 6 L.Ed.2d 105, 116-117 (1961). In Marcus the court struck down a search and seizure at the premises of a wholesale distributor of publications made pursuant to a Missouri statute and court rule authorizing general searches of places where obscene material was believed to be located; the court determined that the mass seizure, which resulted in a previous restraint of widespread nature, was effected without adequate safeguards to protect legitimate expression and was violative of the Fourteenth Amendment. Nothing at all comparable to the mass seizure in Marcus is before us.
The opinion in Bantam Books dealt with the activities of a commission established pursuant to a Rhode Island statute which vested it with the duties of educating the public with respect to books and other materials containing obscene language and of recommending prosecution of violations of pertinent statutory provisions. The commission's practice was to notify a distributor that a certain book or other publication had been determined by a majority of its members to be objectionable for distribution to persons under 18 years of age. Its notice was phrased virtually as an order and was reasonably so understood by the distributor. The court found that the practice of the commission amounted to informal censorship *233 and infringed upon the distributor's constitutional right of freedom of expression. Although it held that there should be a restraint against the practice, it did not declare the statute to be unconstitutional. See 372 U.S., at p. 75, 83 S.Ct., at p. 641, 9 L.Ed.2d, at p. 596.
The great freedoms of expression are invaluable rights guaranteed by both our State and Federal Constitutions and they must be vigilantly guarded. They clearly include the right of distribution for without it the freedoms would lose much of their value. See Lovell v. Griffin, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949, 954 (1938). Precensorship must be rigorously curbed (Bantam Books, Inc. v. Melko, 25 N.J. Super. 292 (Ch. Div. 1953), modified, 14 N.J. 524 (1954); cf. Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957); Times Film Corp. v. Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961)), though certain forms of speech may be declared criminal (Roth v. United States, supra, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498) and certain general regulatory requirements may be imposed despite incidental effects on the freedoms. See Konigsberg v. State Bar of California, supra, 366 U.S., at pp. 50-52, 81 S.Ct., at pp. 1006-1007, 6 L.Ed.2d, at pp. 115-117; cf. City of Absecon v. Vettese, 13 N.J. 581, 586 (1953); Mabee v. White Plains Publishing Co., 327 U.S. 178, 184, 66 S.Ct. 511, 90 L.Ed. 607, 613 (1946).
Chapter 174 contains no elements of precensorship. The distributor may, as heretofore, freely distribute his publications. He incurs no penalty for distributing a publication even after having received a written direction to the contrary. It is only when he is specifically called upon by the retailer to pick up the unwanted publication without charge that he comes under an obligation of promptness which, if willfully disregarded, may subject him to a penalty. It is difficult to see how this elemental and thoroughly decent obligation can in itself be viewed as an unconstitutional restriction on freedom of the press. The retailer admittedly has the unfettered freedom to reject any unordered publication. He may consider *234 it obscene, objectionable though not obscene, or just not salable. His right of rejection is absolute and the State's implementation of that right, in the carefully limited manner set forth in Chapter 174, may readily serve the stated legislative goals without infringing on any constitutional freedoms.
The plaintiff has suggested that future practices and pressures by public officials and private groups may be such that the retailer will not exercise any judgment of his own but will bow to their advance specifications, thus presenting a form of precensorship comparable to Bantam Books v. Sullivan, supra. That is not the situation before us and we therefore need not deal with it. The Supreme Court did not strike the statute in Bantam Books and our only concern at this time is with the validity of the statute and not with practices and pressures which may never materialize. See Isolantite, Inc. v. United Electrical, &c., of America, 132 N.J. Eq. 613, 619 (E. & A. 1942); State v. Bryce, 56 N.J. Super. 83, 90 (App. Div. 1959).
The plaintiff's third and final point is that Chapter 174 violates the constitutional guarantee of the equal protection of the laws. It construes Chapter 174 as exempting newspapers and says that this effects an arbitrary classification. When Assembly 492 was originally passed, it contained a specific reference to newspapers which was later deleted in accordance with a recommendation in the Governor's veto message. For present purposes we may assume that Chapter 174 was intended to exempt newspapers; we are satisfied nonetheless that such an exemption in nowise impairs the constitutional validity of the enactment. See Williamson v. Lee Optical of Okla., supra, 348 U.S., at pp. 488-489, 75 S.Ct., at pp. 464-465, 99 L.Ed., at pp. 572-573; N.J. Restaurant Assn. v. Holderman, 24 N.J. 295, 300, 301 (1957). In Williamson, the Supreme Court upheld an Oklahoma statute which subjected opticians to a regulatory system but exempted sellers of ready-to-wear glasses; in the course of his opinion Justice Douglas had this to say:
*235 "The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Tigner v. Texas, 310 U.S. 141 [60 S.Ct. 879, 84 L.Ed. 1124, 130 A.L.R. 1321]. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. Semler v. Dental Examiners, 294 U.S. 608 [55 S.Ct. 570, 79 L.Ed. 1086]. The legislature may select one phase of one field and apply a remedy there, neglecting the others. A.F. of L. v. American Sash Co., 335 U.S. 538 [69 S.Ct. 258, 260, 93 L.Ed. 222, 6 A.L.R.2d 481]. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination. We cannot say that that point has been reached here. For all this record shows, the ready-to-wear branch of this business may not loom large in Oklahoma or may present problems of regulation distinct from the other branch." 348 U.S., at p. 489, 75 S.Ct., at p. 465, 99 L.Ed., at p. 573
Here the evils aimed at were primarily in the field of books and magazines. The Legislature had the clear right to confine itself to that field so long as it treated similarly circumstanced distributors in similar fashion. There was no disparate treatment among the distributors. Within the well-accepted principles expressed in Williamson, there was patently no denial of equal protection. See Two Guys From Harrison, Inc. v. Furman, supra, 32 N.J., at pp. 228-229; Gundaker Central Motors v. Gassert, 23 N.J. 71, 80-82 (1956); Jamouneau v. Harner, 16 N.J. 500, 519-521 (1954), cert. denied 349 U.S. 904, 75 S.Ct. 580, 99 L.Ed. 1241 (1955).
Affirmed.
HALL, J., concurring in result.
For affirmance  Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN  6.
For reversal  None.
NOTES
[1] In enacting legislation for the public benefit the Legislature may, of course, seek to protect a segment of industry from the abusive practices of a more powerful segment. See Antonio Roig Sucrs. S. En. C. v. Sugar Board of Puerto Rico, 235 F.2d 347, 351 (1 Cir.), cert. denied, 352 U.S. 928, 77 S.Ct. 225, 1 L.Ed.2d 162 (1956); Kuhl Motor Co. v. Ford Motor Co., 270 Wis. 488, 71 N.W.2d 420, 55 A.L.R.2d 467 (1955); cf. Gibraltar Factors Corp. v. Slapo, supra, 23 N.J. 459; Borden Co. v. McDowell, 8 Wis.2d 246, 99 N.W.2d 146 (1959).
[2] Breard has been the subject of persistent questioning by individual members of the Supreme Court. See Perez v. Brownell, 356 U.S. 44, 82-83, 78 S.Ct. 568, 2 L.Ed.2d 603, 627 (1958); Poulos v. New Hampshire, 345 U.S. 395, 425, 73 S.Ct. 760, 97 L.Ed. 1105, 1124 (1953); Beauharnais v. Illinois, 343 U.S. 250, 285, 72 S.Ct. 725, 96 L.Ed. 919, 943 (1952). Its citation here is not intended to intimate agreement with the Supreme Court's holding on the facts before it nor is it intended to intimate that the New Jersey courts would reach a similar result under Art. 1, par. 6 of the State Constitution.