217 N.J. Super. 158 (1986)
524 A.2d 1336
THE SOUTHLAND CORPORATION, PLAINTIFF,
v.
THE TOWNSHIP OF EDISON, DEFENDANT.
ROSEANNE AMENDOLA, T/A MENLO PARK AMOCO, AMOCO OIL COMPANY & AMOCO CORPORATION, PLAINTIFFS,
v.
MUNICIPAL COUNCIL OF THE TOWNSHIP OF EDISON (MIDDLESEX COUNTY) AND THE TOWNSHIP OF EDISON, DEFENDANTS.
Superior Court of New Jersey, Law and Chancery Divisions, Middlesex County.
Decided July 1, 1986.
*160 Lee M. Hymerling for plaintiff Southland Corp. (Archer & Greiner, attorneys).
Vincent D. Paragano for plaintiff Amendola, Amoco Oil & Amoco Corp.
Peter A. DeSarno for defendant.
KEEFE, J.S.C.
The plaintiffs in the two consolidated actions now before the court challenge on various grounds the constitutionality of an Edison Township ordinance that requires plaintiffs' retail businesses to close between the hours of 12 a.m. and 6 a.m. The plaintiffs in one suit are an individual retail gasoline dealer (Amendola), Amoco Oil Company and Amoco Corporation. The plaintiff in the second suit is the Southland Corporation which, through its 7-Eleven Division, operates convenience food stores throughout the country. The court heard extensive testimony over eight days and now makes findings of fact and conclusions of law as required by R.1:7-4.
The ordinance in question provides as follows:
sec. 57-1. Purpose.
It shall be the purpose of this Ordinance to discourage and prevent the present trend of robberies and violent capital crime which occur at retail establishments; and to protect the safety and welfare of the residents of the Township of Edison who patronize and are employed by these retail establishments.

*161 sec. 57-2. Definitions.
The following terms, when used in this Article, shall be construed as follows:
RETAIL ESTABLISHMENT  An establishment, enterprise, or business that sells to the general public goods, merchandise, food or material; and/or automotive fuel, motor oil, goods and services which are generic to gasoline filling and service stations.
Specifically excepted are hotels and motels, supermarkets, diners, restaurants, bars and taverns, truck terminals.
sec. 57-3. Closing hours.
No retail establishment as herein defined, to which the general public is invited, shall be open for business between the hours of 12:00 a.m. and 6:00 a.m. Prevailing time (2400 to 0600 hours).
sec. 57-4. Violations and penalties.
Any person who shall violate a provisions of this Chapter shall, upon conviction thereof, be punished by a fine not exceeding five hundred dollars ($500.00) or by imprisonment for a term not exceeding ninety (90) days, or both. A separate offense shall be deemed committed on each day during or on which a violation occurs or continues.
sec. 57-5. Severability.
If any Article, section, subsection, sentence, clause or phrase of this Chapter is for any reason held to be unconstitutional or invalid, such decision shall not affect the remaining portions of this Chapter, and they shall remain in full force and effect.
The subject ordinance was first considered by the Edison Council in January 1986, although the topic of closing retail establishments had been broached and rejected by the council in 1980 after a young man had been killed at 12:50 a.m. while working in a convenience store located in Woodbridge. The renewed interest in such an ordinance was sparked by the homicide of another young man at a gasoline station in Sayreville on December 25, 1985. The victim of that killing was also working alone after midnight. The crime received a great deal of public attention and an expression of concern by various local legislative bodies. Hearings on the subject have also been conducted by a State Legislative Committee. While the ordinance was under consideration by Edison Council there was *162 another homicide of a young man at a gasoline station in Edison on March 21, 1986. The victim in the most recent homicide was also working alone and was killed between the hours of 11:00 p.m. and 7:00 a.m. There is no question but that the March homicide convinced the Council that the ordinance should be passed.
The Edison Council intended, from the beginning of their consideration of the ordinance, to close gas stations and convenience stores, allowing all other retail operations to stay open. As evidence of their fixed intent they asked the Edison police chief to research crime statistics only as to gas stations and convenience stores and advise the council how many such establishments were open 24 hours per day. It is conceded by defendant that, although the ordinance is not worded as directly as the council intended it has the same effect. It is intended that gas stations and convenience stores close between 12:00 a.m. and 6:00 a.m. while all other retail establishments may remain open. The retail establishments exempted from regulation are identified by enumerated exceptions.
The testimony of Edison Council members contains a common thread of assumptions that were at the heart of their desire to regulate the plaintiffs' operations. The first assumption was that gasoline stations and convenience stores had higher incidences of robberies during the regulated hours than other retail businesses. The second assumption was that the incidence of robberies was due to the way in which these businesses operate as opposed to other retail businesses, that is, easy access to cash, ease of ingress and egress (escape), volume of business being conducted, a minimal number of people employed, youthful employees, and a large turnover of employees (poorly trained). The third assumption was that the exempted businesses did not have the risk factors of robbery present in their operation equal to that of gas stations and convenience stores. The two most important considerations that resulted in the exemption of all other retail businesses were the number of *163 employees on the premises after 12:00 a.m. and the volume of business conducted at those establishments.
Although certain legislative assumptions were made, no research was done by the council as to the number of employees or number of customers present during the late night hours in those establishments closed by the ordinance, or in those establishments permitted to remain open as exceptions to the ordinance. Although some council members on rare occasion patronized late night establishments, no township council members acknowledged patronizing any of the exempted or regulated establishments during the very late night hours.
It was conceded by the defendant that the Council relied heavily upon the views of its Chief of Police. Chief Kermes at one time expressed the view that all retail establishments should be closed after midnight. However, after the March 21, 1986 homicide his letter to the mayor requesting action recommended only that all night gas stations be closed. In January of 1986 Chief Kermes provided the Edison Council with a memorandum reflecting the robbery experience of convenience stores and gas stations in Edison during 1985. This memorandum indicated that while there were seven robberies of gas stations in 1985, there were no such robberies in convenience stores. Chief Kermes was not asked to produce crime statistics on the exempted businesses, nor was he consulted with regard to the exceptions in the Ordinance, except to be asked by the Township attorney whether he would object to closing convenience stores, as well as gas stations.
The Chief believes that crime is essentially unpreventable and unpredictable as to where and when it will occur, especially as to when a robbery will result in a homicide. While he attempted to define those characteristics of gas stations and convenience stores that he believes make them special robbery targets, he delineated no specific characteristics which made a convenience store different from any of the establishments the Ordinance permits to remain open. While Chief Kermes testified *164 that a convenience store characteristically only has one attendant on duty during the midnight hours, is accessible to highways and is staffed by youthful clerks who are constantly changing employment, he also testified that the age of a clerk is really not important, the number of employees on duty may be irrelevant to the occurrence of a crime, and all business establishments in Edison are easily accessible to major state or interstate highways. The Chief conceded that, despite the express legislative finding in the Ordinance, he could not state there existed either a trend of robberies or of violent capital crimes occurring in convenience stores.
Edison police records show that the most recent armed robbery of a convenience store occurred on April 27, 1984, in a Krauzers. This robbery, however, occurred prior to midnight. The most recent robbery that occurred in a convenience store between midnight and 6:00 a.m. occurred on December 28, 1981, at 1:25 a.m., also in a Krauzers. In the last six and one-half years there have been only seven robberies in approximately ten Edison convenience stores, regardless of the hours. No robberies have occurred in over two years. Chief Kermes also acknowledged that the effect of an ordinance such as this would be to displace robberies either in time (to the hours of opening and closing, which are the periods of greatest vulnerability to robbery), or by place (to those business establishments that the ordinance permits to remain open).
Southland now operates a total of 211 franchised 7-Eleven stores throughout New Jersey. Three of these stores are located in Edison Township. The three 7-Eleven stores are located on Vineyard Road, Lafayette Road, and Woodbridge Avenue. Prior to the enactment of the disputed ordinance, the Vineyard Road and Lafayette Road stores operated on a 24-hour basis. The Woodbridge Avenue store closed between midnight and 5:00 a.m.
A 7-Eleven store offers virtually the same product lines as that offered in a supermarket. The vast majority of 7-Eleven *165 stores nationally are open 24 hours a day. Late night sales represent a significant proportion of a 7-Eleven store's business. Based upon national market data, 16% of a 7-Eleven store's sales are made between midnight and 6:00 a.m. During the same period of time, 13% of 7-Eleven's customer traffic enters their stores. During the late night shift (11:00 p.m.-7 a.m.), the same study reveals 21% of customer traffic and 23% of sales. Applying national statistics to Edison's two 24 hour stores, these stores average approximately 315 customers per night (11 p.m.-7:00 a.m.). Based upon national marketing statistics, the hours between 12:00 midnight-1:00 a.m. and 1:00 a.m.-2:00 a.m. each represent 4% of a 7-Eleven store's sales. Comparable percentages are yielded during the 7:00 a.m.-8:00 a.m.; 8:00 a.m.-9:00 a.m.; 9:00 a.m.-10:00 a.m.; and 10:00 a.m.-11:00 a.m. hours. Although customer traffic slacks off after 2:00 a.m., this time is profitably used to accept deliveries, stock shelves and clean the store.
The adoption of the ordinance adversely affects Southland and its franchisees in several ways: (a) significant gross sales will be lost. (During the course of a year, Southland projects that the two former Edison 24-hour stores will lose approximately $180,000-$200,000 in gross sales. The third store will lose approximately $60,000 in gross sales as a result of the ordinance.); (b) over a period of time, customer loyalty will be jeopardized; (c) established patterns of customer buying habits will be broken; and (d) 7-Eleven stores will experience a competitive disadvantage against competitors allowed to remain open.
This competitive disadvantage will not only affect 7-Eleven stores during the hours in which they are forced to close, but also during other hours of operation. Sales figures for the first three full weeks following the effective date of the ordinance show that sales losses have been approximately 15%-17% in the two former 24-hour stores, and 3.5% in the non-24-hour store. This takes into account not only actual sales loss experienced by the two 24-hour stores, but also the anticipated seasonal *166 sales increase that might have been experienced were it not for the adoption of the ordinance.
Southland developed a robbery and violence prevention program that emphasizes training, cash control, lighting, visibility, awareness and demeanor. Southland's franchisees are trained in robbery prevention. Training focuses upon cash control and non-resistance during robberies. Training materials are also made available for their employees. Tydell Cash Controllers have also been installed. A cash controller is a time controlled device that regulates a clerk's access to cash. The crime prevention program also incorporates the use of physical changes within the store that are designed to reduce the threat of robbery and violent crime. These changes include lighting so that clerks are able to see out while police are still able to see in, and the lowering of gondolas and racks in front of the cash registers to make them visible. Southland's Robbery Prevention Kit is made available to franchisees and their employees as well as competitors. Southland has assisted communities, including Edison, by making presentations of the Southland crime prevention system.
The Southland crime prevention program was implemented in the immediate area in or about 1979-1980. In 1980, the Northeastern Division, which now consists of 104 stores, including the Edison stores, experienced 22 robberies. Only 13 robberies took place in the 211 7-Eleven stores located state-wide during 1985. In 1979, prior to the full implementation of Southland's crime prevention program, Southland's three 7-Eleven stores located in Edison experienced four robberies. Since then only one robbery has been committed, and that occurred in 1981 at 10:45 p.m. Based upon last year's statewide 7-Eleven experience, a robbery is likely to occur in a New Jersey 7-Eleven store once every 16.2 years. Based upon Edison's experience in this decade, a robbery is likely to occur in a 7-Eleven store in Edison once every 19.2 years.
*167 Multiple late night establishments in Edison were visited by two "customers" employed by Southland. The establishments included, inter alia: bars, taverns, restaurants, diners, supermarkets, and truck stops. A number of these establishments were staffed with as few as one employee. Further, most of these establishments had no more than one or two customers. Some had none.
Franklin S. Zimring, J.D., Professor of Law and Director of the Earl Warren Legal Institute at the University of California Law School at Berkeley, testified as an expert in the area of criminology and deterrence. Professor Zimring testified that a study conducted by him of robberies in the City of Chicago identified five factors which influenced the rate of lethal violence in a commercial robbery, the objective this ordinance seeks to address. These factors are: (1) the number of robberies in general: the larger the number of robberies, the higher the death rate; (2) the use of guns in robbery: lethal violence is three times more likely to occur in a robbery in which a gun is used; (3) the number of commercial robberies committed: death rates in commercial robberies in Chicago were seven times greater than death rates from street robberies; (4) the sex of the robbery victim: a male victim has an eight times greater chance of being killed than a female victim; and (5) the occurrence of victim resistance: a victim who resists is 49 times more likely to be killed in a commercial robbery than a victim who does not resist. The single most important factor in preventing death from robbery is the avoidance of victim resistance. If victim resistance were totally avoided, the witness opined that 75 percent of the deaths attributable to the robberies studied in Chicago would not have occurred.
Based on his review of the subject Ordinance, Professor Zimring determined that the Ordinance, despite its stated purpose of reducing robbery and robbery violence, will not have any measurable impact on the general rates of robbery and robbery violence in Edison because it does not address the risk factors identified as having an impact on the incidence of crime. *168 The distinctions that permit some businesses to remain open while requiring convenience stores and gas stations to close have, in his opinion, no relevance to a criminological foundation or theory because the nature of the business does not automatically address the risk factors which are deemed to be significant. Zimring's view is that, by utilizing the risk factors, ordinances can be enacted which would minimize robbery or the risk of violence from robbery.
Zimring also testified that one effect of the closing of convenience stores and gas stations will be to displace the occurrence of robbery to other late night commercial establishments in Edison. There are three types of displacements: displacement as to place, displacement as to time, and displacement as to type of crime. While a particular crime is never displaced 100 percent, he believes that the Edison Ordinance will result in maximum displacement as to place because numerous other establishments, which present similar robbery opportunities, are permitted to remain open.
Southland also presented the expert testimony of Wayman Crow, Ph.D., who was qualified as an expert in the fields of the psychology of robbery, robbery deterrence and violence prevention. Dr. Crow initiated two research projects that were designed to determine, from the point of view of the robber, those factors which made a particular commercial establishment susceptible to robbery. The first study is entitled Robbery Deterrents as Applied to Behavioral Science Demonstration. (Western Behavioral Science Institute, 1975) The second study took place in 1984 and was published in 1985. It consisted of interviews in five state prisons with prisoners who had been incarcerated for a period of less than one year for the crime of armed robbery.
The first study began with conversations with paroled convicts, law enforcements personnel, store clerks and managers, and private security officials to determine what factors made a particular commercial establishment susceptible to robbery. *169 Next, the study examined approximately 17,000 robbery records, which were accumulated over a five and one-half year period. A review of these robbery records showed that the incidence of robbery was not randomly distributed among commercial establishments. Instead, 24 percent of the commercial establishments accounted for 72 percent of the robberies. Based on these interviews and reviews of the robbery records, the first study extracted certain factors that were important in determining the susceptibility of a commercial establishment to robbery. The factors identified were as follows: (1) the amount and availability of cash in the commercial establishment, (2) aspects of the store that would affect the anonymity of the robber, (3) the probability of interference during the course of the robbery, (4) the amount, intensity and balance of the lighting both outside and inside the store, (5) the accessibility and availability of escape routes, and (6) the location and visibility of the cash register within the store.
In order to test the hypothesis that the identified factors would, in fact, influence the susceptibility of a store to robbery, an experiment was conducted. One Hundred Twenty 7-Eleven stores in the San Diego areas were selected and divided into two groups. One group was selected to be the control group, while the robbery prevention measures were applied to the second group. In the second group the store clerks were trained how to control cash, as well as how to react in the event of a robbery. Physical changes were made to the stores to increase visibility of the clerk and cash register. Adjustments were made to the lighting and cash registers were repositioned to be visible from outside the store. The results of the experiment reflected that over the eight month test period, the experimental stores experienced 30 percent fewer robberies than did the control group. As a result of this study, Dr. Crow and Southland jointly developed Southland's robbery prevention program.
In order to verify the factors relating to robbery susceptibility identified in the 1975 study, Dr. Crow performed another *170 study in 1984 and 1985. He interviewed prisoners in five states' penitentiaries. Among other things, these prisoners were asked to rate the importance to them of certain factors or aspects of a particular commercial establishment with regard to robbery. In descending order of importance, the factors are as follows:
(1) Amount of money
(2) Escape route
(3) Anonymity
(4) Interference
(5) Active Police Patrol
(6) Armed Clerk
(7) Number of Clerks
(8) Number of Customers
(9) Camera System
(10) Alarm System
(11) Video Recording System
The data assembled by Dr. Crow indicates that the number of people present in a commercial establishment is relatively unimportant to an armed robber. Robbers felt they could easily control four or five people; and if two robbers were present and both were armed, they felt they could handle up to ten people during a robbery. The number of persons present is made less important by the trend toward a robbery being conducted by more than one perpetrator.
The principles established by Dr. Crow with regard to robbery susceptibility are applicable to all types of commercial establishments that handle or maintain cash. Therefore, Dr. Crow offered the opinion that the subject Ordinance will not reduce the risk of robbery or robbery violence. From his established research and data in the field of criminology, he believes there is no rational connection between the intent of the Ordinance (reducing robbery and robbery violence) and its methodology (regulating hours of operation). More important, it is his view that there is no criminologically supportable basis or data to justify the distinction that the Ordinance draws *171 between those businesses which are permitted to remain open and those which must be closed.
Officer Hartung, the Crime Prevention Officer of the Howell Township Police Department and the President of the New Jersey Crime Prevention Officers Association also testified as to those factors that make a particular commercial establishment susceptible to robbery. His testimony was based upon his training and experience in the area of crime prevention. His testimony was corroborative of Dr. Crow's in that the factors identified by Dr. Crow, and stressed in the Southland Crime and violence prevention program, are those which are taught by State and local police as relevant to robbery and violence prevention. These factors apply to all commercial establishments. Since the ordinance does not address the robbery risk factors, it was his opinion that it will have no real impact on robbery or violence, especially because so many commercial establishments are permitted to remain open to which the potential robberies will be displaced.
Plaintiff Amendola's Amoco station is a modern "gas pumper" facility located on U.S. Route 1, a major north-south corridor. She purchased the station in May 1985. It was then a 24-hour operation. Her agreement with Amoco requires that she maintain a 24-hour operation. As a result of this ordinance she has experienced a 1000 gallon per day drop in fuel sales, which equates to a loss of $80-90/day.
The subject station was designed to deter robbery. There are three alarm buttons connected to police headquarters. The booth also has bullet resistant glass, which is alarmed and connected to police headquarters. The money is placed in a burglar proof drop safe. Her employees are trained in cash management and are also trained not to resist robberies. She has experienced no robberies at her station.
Several gas station operators were called by Edison as witnesses. They testified that, although operations between midnight and 6:00 a.m. were not profitable, they are required to *172 stay open because of their franchise agreements. While they testified in support of the ordinance obstensibly for safety reasons, their personal experience did not support such a conclusion. One operator owns two stations and has 10 years experience. His station on the Garden State Parkway was robbed three times. Only one of the three robberies took place between 12:00 a.m. and 6:00 a.m. Another robbery took place at 9:00-10:00 p.m. when there were four employees present and a lot full of customers. The third took place at 8:00 a.m. Another operator of 18 years had no experience with armed robberies. His complaint was that he had difficulty getting help after midnight and that employees tend to get "hassled" by late night customers. The third operator had 30 years experience and related one incident of a robbery accompanied by an injury to an employee that took place in February or March 1985. Closing after 11:00 p.m. was a matter of dollars and cents to him.
Under New Jersey law, municipalities have the power by statute to enact ordinances in support of their police power to the extent that such ordinances advance "the protection of persons and property, and are for the preservation of the public health, safety and welfare of the municipality and its inhabitants...." N.J.S.A. 40:48-2. The preamble to the Edison ordinance on its face expresses both a public necessity and an appropriate public objective, i.e., the protection of people within its borders from robbery and violent crime. Such ordinances carry a presumption of validity. Legislative bodies are presumed to act on the basis of adequate factual support. They have broad discretion in assessing the public need and the means requisite for the public's protection. Jamouneau v. Harner, 16 N.J. 500, 514-515 (1954).
Legislative power, of course, is not unbridled. Where legislation undertaken in the name of public necessity collides with basic rights of private property, as in this case, those who are affected by the ordinance may challenge both the existence of the public need for the ordinance and the methods by which *173 government attempts to achieve the desired end. Questions of policy and "fairly debatable" objectives and means, however, are resolved in favor of government. It is not the function of a court to be a "superlegislature" and substitute its judgment for that of the duly elected legislative body. Hudson County News Co. v. Sills, 41 N.J. 220, 229 (1963).
Article I of the New Jersey Constitution affords our citizens the right to acquire, possess and protect property. Thus, New Jersey citizens have a guaranteed right to pursue lawful vocations unless there is a superseding public need which requires that the lawful pursuit be regulated. The Fourteenth Amendment to the United States Constitution embodies a similar concept. In Katobimar Realty Co. v. Webster, 20 N.J. 114 (1955), Justice Heher dealt with these two sources of individual rights as one when analyzing a zoning ordinance under challenge. Such ordinances are generally considered to be authorized under the police power. Zoning ordinances and crime prevention ordinances, therefore, share a common basis for analysis since both stem from government's exercise of its police power. The concept of how constitutional due process fits into the conflict that sometimes arises when government's exercise of the police power clashes with private rights was addressed very clearly by the Supreme Court in Katobimar. It held:
The police function cannot be expressed in terms of a definitive formula that will automatically resolve every case, for its quality and scope are commensurate with the public exigencies arising from ever-changing social and economic conditions. But it is basic to zoning, as with every exercise of the police power, that it be contained by the rule of reason; constitutional due process and equal protection ordain that the exertion of the authority should not go beyond the public need; there cannot be unnecessary and excessive restrictions upon the use of private property or the pursuit of useful activities; a substantial intrusion upon the right infringes essential individual liberties immune to legislative interference. The restrictions may be so unreasonable as to be confiscatory, and the regulation then transgresses the organic law as arbitrary and oppressive. Brandon v. Board of Com'rs of Town of Montclair, 124 N.J.L. 135 (Sup.Ct. 1940), affirmed 125 N.J.L. 367 (E. & A. 1940).
The police power is the public right to reasonable regulation for the common good and welfare. The constitutional principles of due process and equal *174 protection demand that the exercise of the power be devoid of unreason and arbitrariness, and the means selected for the fulfillment of the policy bear a real and substantial relation to that end. [20 N.J. at p. 122-123; emphasis supplied.]
The lesson of this case is that when governmental action comes under either due process or equal protection scrutiny, the fundamental question for the reviewing court is whether the ordinance exceeds the rule of reason because there is either no public need to act upon or because the restrictions imposed unreasonably and irrationally exceed the public need.
This court has elected to analyze the current case under this State's constitutional concepts since the nature of the issues now before it (private property rights vs. the police power) afford our citizens broader rights than might be allowed under federal law. In Right to Choose v. Byrne, 91 N.J. 287 (1982), Justice Pollock speaking for the court said:
In more expansive language than that of the United States Constitution, Art. I, par. 1 of the New Jersey Constitution provides `All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness.' The state Bill of Rights, which includes that provision, has been described as expressing `the social, political and economic ideals of the present day in a broader way than ever before in American constitutional history.' Milmed, "The New Jersey Constitution of 1947" in N.J.S.A. Const., Arts. I-III, 91 at 110 (1971). 91 N.J. at 303.
Thus, in appropriate cases, the individual states may accord greater respect than the federal government to certain fundamental rights. Although the state Constitution may encompass a smaller universe than the federal Constitution, our constellation of rights may be more complete. [91 N.J. at 300.]
In electing this approach the court can avoid certain formalistic tests established by federal decisional law. Under the New Jersey Constitution courts do not have to determine that a right is "fundamental" in order to give one who possesses the right a measure of protection, nor does the court have to determine such things as "suspect" classification when considering discriminatory applications of the law. Robinson v. Cahill, 62 N.J. 473, 491-492 (1973). "Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary. *175 In that process, if the circumstances sensibly so require, the Court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial." Ibid. When the issues before the court raise equal protection as well as due process questions New Jersey uses the "means focused" standard. Under such a standard the question to be answered simply is "whether there is an appropriate governmental interest suitably furthered by the differential treatment." Borough of Collingswood v. Ringgold, 66 N.J. 350 (1975).
The plaintiffs here claim that the ordinance is not reasonably related to the public health and safety, but is arbitrary, overbroad, and confiscatory, beyond the legitimate use of the police power, and, thus an invasion of the right of private property. While the presumption of validity is not irrebuttable the law imposes "a heavy burden on the party seeking to overturn the ordinance". Hutton Pk. Gardens v. West Orange Town Council, 68 N.J. 543, 564 (1975). The plaintiffs here must prove by "clear evidence ... that there is a transgression of constitutional limitation or the bounds of reason." Tp. of Little Falls v. Husni, 139 N.J. Super. 74, 80 (App.Div. 1976).
The legislative declaration of a public emergency (in this case, a "present trend of robberies and violent capital crime which occur at retail establishments") is not conclusive evidence of legislative authority to act, nor of the reasonableness of the methods chosen. As our Supreme Court has held, "a law that depends on the actuality of an emergency or a particular state of facts giving rise to the exercise of the power may lose its efficacy when the basic factual conditions no longer obtain." Jamouneau v. Harner, supra., 16 N.J. at 514-515 (1954). The facts of each case are, therefore, critical to the judicial inquiry initiated by plaintiffs. Cases decide facts, not law. Feldman v. Lederle Laboratories, 97 N.J. 429, 455 (1984). Thus, while citations to passages from cases that have reviewed legislative enactments are helpful in establishing guidelines, no single case is determinative of the current one.
*176 It is for the reason just stated that the court rejects defendant's argument that Quick Chek Food Stores v. Springfield Tp., 83 N.J. 438 (1980), controls the outcome of this case. That case was a zoning case wherein the municipal police power was being utilized to ensure the peace, quiet and comfort of the homes abutting a neighborhood-commercial zone. The court simply found that such a regulation was, under the facts of that case, reasonably related to a proper zoning objective. The practical effect of the ordinance was to reduce noise in the residential areas of the town. Commercial establishments in other areas of the town were not affected by the ordinance. Justice Schreiber, writing for the court, recognized that other factual circumstance could produce a different result when he said:
(A) difference exists between a general closing law applicable to all retail establishments in a municipality which may be arbitrarily overbroad insofar as its purposes are concerned and one that is reasonably tailored to meet a particular situation. [83 N.J. at 450.]
Although these are consolidated actions, the evidence and the legal rules of construction stated herein require a separate analysis of each plaintiff's case. In addressing the Southland case first, the court's initial inquiry is whether the record evidences a public need that justifies governmental action against Southland and similar stores. A review of the evidence compels this court to find that Edison has no special problem with armed robbery or other violent crimes in convenience stores from midnight to 6:00 a.m.
Edison's experience with convenience stores beginning in 1980 is particularly enlightening. As mentioned earlier, the Edison Council considered closing convenience stores after the homicide of a convenience store employee in Woodbridge. The Council opted not to legislate at that time in favor of an alternative plan suggested by Southland and others. Convenience store operators worked with Edison's Crime Prevention Bureau to reduce those factors that had led to robberies. Edison's crime statistics clearly show that the effort succeeded. *177 There have been no robberies of convenience stores in two years, regardless of the hour, and the last robbery during the hours of 12:00 a.m. to 6:00 a.m. was in December 1981. There have been no homicides.
If this ordinance had promulgated a regulatory scheme addressed to those items that reduced the incidence of crime in convenience stores after 1980, there would be less of a burden on government to show a compelling public need. However, the subject ordinance is so prohibitory in its impact on Southland that government is properly required to present evidence of a compelling public need in order to justify such a drastic measure. Robinson v. Cahill, supra, 62 N.J. at 491-492. Plaintiff Southland's evidence clearly establishes the absence of such a compelling public need. Thus the court must conclude that the ordinance is unenforceable as to Southland and establishments within its class. See also, Jamouneau v. Harner, supra, 16 N.J. at 515.
The identical analysis as to Amoco and Amendola, however, yields a contrary result at the first level of inquiry. Edison's crime reports show seven gas station robberies during 1985. Three of those robberies were during the regulated hours of operation. Those statistics standing alone might not be sufficient to either establish a "trend" or warrant regulation of gasoline stations. However, the Edison Council was justified in considering those incidents and the homicide of a station attendant in Sayreville in December 1985. The March 1986 murder at a Hess station in Edison coupled with the foregoing facts was a sufficient basis for the Edison Council to declare a public need to act. Professor Zimring conceded that those homicides that were close in time and geographical proximity alarmed him. He also conceded that "late night hours" can enhance vulnerability to robbery. The New Jersey Uniform Crime Report for 1985 noted that robberies in gas stations increased 21% in that year.
*178 Plaintiff argues that, aside from the two recent homicides, the Edison crime reports as well as the expert testimony as to the number of robbery incidents for all commercial establishments show no greater incidence of robberies after midnight than before. That is indeed what the experts said. However, the court believes their reasoning to be flawed in one respect. In order to draw a conclusion that the risk of violence is no greater after midnight than before, one must factor in the number of businesses closed after midnight as compared to before midnight. Simply comparing the number of robberies before and after midnight is misleading. Moreover, this court cannot say as a matter of law that the Edison Council should have disregarded the two homicides when forming its conclusion that there was a "present trend of robberies and violent capital crime" during the hours of 12:00 a.m. and 6:00 a.m. The law does not require a legislative body to justify its determination of a public problem and its focus on the source of the problem by empirical data. So long as there is some reasonable basis for the decision, no matter how debatable it is, legislative action should not be overturned. Frumer v. Cheltenham Tp., 709 F.2d 874, 877 (3d Cir.1983).
It is the second level of inquiry that presents the most significant challenge to the ordinance. Here the issue is whether the restrictions imposed unreasonably and irrationally exceed the public need. Plaintiffs Amendola and Amoco argue that if there is a need for legislative action such action should focus on regulations which bear a real and substantial relation to the goal of reducing the incidents of robberies at gas stations. They argue correctly that all the evidence from both plaintiffs' and defendant's witnesses establish common factors which tend to affect vulnerability to robbery. Some of those factors such as accessibility to escape routes and volume of business are difficult to regulate and police. However, other factors such as lighting, visibility, cash control methods, number of employees, security and employee training are susceptible to regulation and are logical means to attain a legitimate legislative goal. *179 Under such an ordinance a gas station operator would have an opportunity to comply and remain open to pursue a legitimate business. However, under the present ordinance, as plaintiffs argue there is no such opportunity for a business to respond to those factors that lessen the risk of robbery. See, e.g., Tp. of Little Falls v. Husni, supra., (in which an ordinance required laundromats to close unless an attendant was on duty).
Amendola has undeniably proven that her station substantially complies with those factors that are acknowledged to have a tendency to reduce the risk of robbery. She complains that this ordinance paints with too broad a brush in that it treats her in the same way as other gas stations who do not have security, proper lighting, cash control, and trained employees. The logic of Amendola's and Amoco's argument is compelling.
The Edison Council cannot justify its action on the grounds of a "reasonably debatable" exercise of judgment if the evidence shows that the legislative measure exceeds the public need. To repeat the statement of Justice Heher in Katobimar is appropriate. "(T)here cannot be unnecessary and excessive restrictions upon the use of private property or the pursuit of useful activities, a substantial intrusion upon the right infringes individual liberties immune to legislative interferences. The restrictions may be so unreasonable as to be confiscatory, and the regulation then transgresses the organic law as arbitrary and oppressive." 20 N.J. at p. 122-123. To phrase this principle in more colloquial terms one court stated, "(M)unicipalities should not `burn the house to roast the pig'." Larson v. Mayor and Council of Spring Lake Heights, 99 N.J.Super. 365, 374 (Law Div. 1968); see also, Kirsch Holding Co. v. Bor. of Manasquan, 59 N.J. 241, 252 (1971).
The Edison ordinance if sustained as to gas stations alone would prohibit business during six hours of a day in which all other retail establishments are allowed to operate. While the court has found that Edison has a sufficient basis to enact a regulatory ordinance it believes that the "rule of reason" requires *180 more of government to justify such a sweeping prohibition than has been shown here. The evidence does not support the conclusion that nothing less than complete prohibition will achieve the legislative goal. The experience of 7-Eleven in Edison since 1980 is strong proof of this result.
The testimony of service station operators produced by Edison in favor of the ordinance did not support the legislative approach from a criminological point of view. If anything, their testimony supports plaintiffs' argument that robbery can occur at any time regardless of the number of employees on duty and customers on the premises. They are, of course, more willing to bear the risk during the times that their business volume justifies being open. The real import of their testimony was that the volume of business during the late night hours did not warrant staying open 24 hours per day. They claimed that they were forced to do so by reason of their agreements with the oil companies. The evidence leaves the court with the impression that the Council members were incensed by the thought that these operators did not have freedom of choice. There is no doubt that this issue motivated the Council to some extent in deciding to close gas stations rather than impose other regulations. Regulations such as additional employees, more lighting, added security, cash drop boxes and the like would tend to increase the costs of operation for gasoline dealers who are already operating at a low profit margin. Given the fact that many oil companies require their franchisees to remain open 24 hours per day, the Council may very well have been motivated to act in a manner which they thought was beneficial to a majority of the gasoline dealers. But such a legislative motive in this context is improper. The Edison Council may not do by indirect means that which it would be prohibited from doing directly. The franchise relationship between the oil companies and their franchisees is not the province of municipal regulation. That relationship has clearly been pre-empted by federal law. Di Napoli v. Exxon Corp., 549 F. Supp. 449 (D.N.J. 1982); Ricco v. Shell Oil Co., 180 N.J. Super. 399 (Ch. *181 Div. 1981). While the court does not believe that this motive was the sole basis for the Council's conduct, the factor was a strong one which, taken in conjunction with the other factors, combines to nullify this ordinance in its present posture.
Finally, in connection with the reasonableness of the defendant's conduct in the choice of means to attain a legitimate legislative goal the court takes judicial notice of ordinances from surrounding municipalities that have addressed this problem in the wake of the two homicides. Evid.R. 9(2). No municipality has sought to completely prohibit retail establishments from operating during certain hours.
The ordinances in effect in Sayreville, South River, Old Bridge, Woodbridge, and North Brunswick provide that all business and commercial establishments to which the public is invited, in the interest of the protection of the employees, patrons and law enforcement officers, must close from 11:00 p.m. to 5:00 a.m. unless there are two (2) employees on continuous duty in that part of the establishment to which the public is invited; and in addition, that a security officer or a security device which will activate police response be employed.[1] East Brunswick's ordinance requires a security officer or a security device be employed, presumably in addition to one employee or two employees.
The Borough of Carteret's ordinance represents a third variation of this theme. It requires two (2) employees, or an employee and a security officer. No security devices are required by this ordinance. Without exception all the ordinances state:
It has been determined that unprotected and under-staffed business and commercial establishments are prey to the criminal element in our society during the late night and early morning hours and that certain security devices must be provided in order to protect the general public who use these establishments.
*182 In conclusion the court holds that the Edison ordinance 0.276-86 is unconstitutional as presently worded. There was a sufficient public need to justify a regulatory ordinance, however, the complete prohibition against business during the hours of midnight and 6 a.m. is overbroad, unreasonable and irrationally exceeds the public need.
NOTES
[1] Assembly Bill, No. 1722 encompasses the same requirements. Senate Bill, No. 1927 requires more, the two employees must receive training in security procedures and crime prevention and cameras must be employed.